Ronald S. STVARTAK, Plaintiff,

v.

EASTMAN KODAK COMPANY,
Defendant.

No. 95–518–Civ–ORL–19.

United States District Court,
M.D. Florida,
Orlando Division.

Nov. 15, 1996.

Harvey M. Alper, Massey, Alper & Walden, P.A., Altamonte Springs, FL, for Ronald S. Stvartak.

Gregory D. Swartwood, Unger, Swartwood, Latham & Whitaker, P.A., Orlando, FL, for Eastman Kodak Company.

### MEMORANDUM OF DECISION

GLAZEBROOK, United States Magistrate Judge.

## I. INTRODUCTION

Defendant Eastman Kodak Company ["Kodak"] employed plaintiff Ronald S. Stvartak ["Stvartak"] for sixteen years as a technical sales representative. On May 19, 1989, Kodak informed Stvartak that Kodak was terminating his employment. At that time, Stvartak was a plan participant in two employee welfare benefit plans providing disability benefits. Kodak established and maintained the plans pursuant to the Employee Retirement Income Security Act ("ERISA"). See 29 U.S.C. § 1002(1), (3), (5), (7), (8); Defendant's Exhibits ["DX"] 1, 3 at 11, 4 at 13. As of May 19, 1989, Stvartak was a plan participant in the Kodak Short-Term Disability Plan (Plan No. 516; Benefit Plan No. 1D.01) established July 15, 1985. DX4 at 13. The operative amended plan document ["STD Plan"] ["DX4"] became effective April 1, 1989. DX4 at 13. As of May 19, 1989, Stvartak also was a plan participant in the Kodak Long-Term Disability Plan (Plan No. 506; Benefit Plan 1D.02) established November 1, 1972. DX3 at 11. The operative amended plan document ["LTD Plan"] ["DX3"] became effective July 13, 1988. DX3 at 11. The 1987 Summary Plan Description ["1987 SPD"] [DX1] summarizes both the STD Plan and the LTD Plan.

David E. Edwards, Director of Employee Benefits, Corporate Human Resources, Eastman Kodak Company is the Plan Administrator for both the STD Plan and the LTD Plan. DX3 at 11; DX4 at 3 and 14. With regard to the LTD Plan but not the STD Plan, Kodak has entered into a trust agreement appointing Citibank, N.A. as a trustee of the Kodak Welfare Benefit Plans Trust through which Kodak makes payments of benefits on an uninsured basis. DX3 at 11. Also with regard to the LTD Plan but not the STD Plan, Kodak has entered into an administrative services agreement [DX6] with Metropolitan Life Insurance Company ["MetLife"] as a "claims administrator" to process, review, approve, deny, and pay LTD benefit claims on an uninsured basis. DX3 at 11; DX6.

Stvartak brings this action against Kodak pursuant to 29 U.S.C. § 1132(a)(1)(B) to recover benefits which he claims are due under the LTD Plan. See Pretrial Statement ["PTS"], Docket No. 37 at 1. Specifically, Stvartak does not claim money damages, but rather seeks declaratory relief ordering Kodak to pay past and future long-term disability benefits due under the LTD Plan. PTS, Docket No. 37 at 9. Although Stvartak claims that the STD Plan entitles him to STD benefits as well, he waives any claim that he might have to recover STD benefits. Stvartak also seeks attorneys' fees pursuant to 29 U.S.C. § 1132(g)(1). PTS, Docket No. 37 at 15. The district court has subject matter jurisdiction, and venue is proper in the Middle District of Florida. 29 U.S.C. § 1132(e); 28 U.S.C. § 1331. The Court conducted a nonjury trial on November 4–6, 1996.

## II. STANDARD OF REVIEW

This Court must analyze the facts available to Kodak's Plan Administrator at the time he denied benefits under the "arbitrary and capricious" standard appropriate in cases involving a conflict of interest. See Godfrey v. BellSouth Telecommunications, Inc., 89 F.3d 755, 757, 760 (11th Cir.1996); Florence Nightingale Nursing Service, Inc. v. Blue Cross, 41 F.3d 1476, 1480–82, 1486 (11th Cir.), cert. denied, —— U.S. ——, 115 S.Ct. 2002, 131 L.Ed.2d 1003 (1995); Lee v. Blue Cross, 10 F.3d 1547, 1551 n. 3, 1552 (11th Cir.1994); Anderson v. Blue Cross, 907 F.2d 1072, 1076 (11th Cir.1990); Brown v. Blue Cross & Blue Shield of Alabama, Inc., 898 F.2d 1556, 1566–67 (11th Cir.1990), cert. denied, 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991); see also, Docket No. 46 at 10–12 (order of the Honorable Patricia C. Fawsett regarding summary judgment on standard of review). Both parties agreed at trial that the "arbitrary and capricious" standard and

conflict of interest analysis applies to this case.[1]

■ Application of the arbitrary and capricious standard generally requires the district court to look only to the facts known to the administrator at the time the decision was made to deny coverage. *Lee,* 10 F.3d at 1550. The first step in the application of the arbitrary and capricious standard, however, is to determine—*from the perspective of de novo review*—whether the fiduciary's interpretation of the disputed plan provision is legally correct or legally wrong. *Lee,* 10 F.3d at 1550; *Brown,* 898 F.2d at 1567, n. 12. In determining whether the fiduciary's interpretation is legally correct, this Court must determine whether Stvartak has proposed a sound interpretation of the plan to rival Kodak's interpretation. *Lee,* 10 F.3d at 1550; *Brown,* 898 F.2d at 1570.

■ If a fiduciary's interpretation is wrong, the Court then evaluates the self-interest of the fiduciary. *Brown,* 898 F.2d at 1567, n. 12. If a plan participant demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretation of the plan was not tainted by self-interest. *Brown,* 898 F.2d at 1566. Nevertheless, "a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries." *Godfrey,* 89 F.3d at 758; *Brown,* 898 F.2d at 1566–67; *Lee,* 10 F.3d at 1550.

■ The Court must then evaluate whether the plan administrator acted arbitrarily and capriciously in adopting a different interpretation. The Eleventh Circuit has equated the arbitrary and capricious standard as interchangeable with the abuse of discretion standard. *Brown v. Blue Cross and Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1558 n. 1 (11th Cir.1990). The district court must determine whether there was a reasonable basis for the decision to deny benefits based on the facts known to the fiduciary at the time he made the decision. 898 F.2d at 1559. The common law establishes factors for measuring abuse of discretion in the administration of a trust:

(1) the extent of the discretion conferred upon the trustee by the terms of the trust; (2) the purposes of the trust; (3) the nature of the power; (4) the existence or non-existence, the definiteness or indefiniteness, of an external standard by which the reasonableness of the trustee's conduct can be judged; (5) the motives of the trustee in exercising the power; (6) the existence of an interest in the trustee conflicting with that of the beneficiaries.

Restatement (Second) of Trusts § 187, comment d; *Brown,* 898 F.2d at 1564–65.

## III. THE LAW REGARDING EMPLOYEE WELFARE BENEFIT PLANS

### A. The Statutory Claims Procedure

The ERISA statute prescribes a claims procedure. First, every employee benefit plan must provide adequate notice in writing to any participant whose claim for benefits has been denied. 29 U.S.C. § 1133. The

---

1. Nevertheless, the plan provisions in the only LTD Plan applicable to Stvartak [the June 13, 1988 LTD Plan, DX3; DX1] bear little resemblance to the typical plan provisions cited in recent decisions of the United States Court of Appeals for the Eleventh Circuit as the basis for deferential review. In a previous order, the district court applied an arbitrary and capricious standard relying on the revised language in Kodak's 1993 summary plan description. Although the revised language indeed confers the requisite discretionary authority to determine eligibility and construe terms, Kodak made the revision *after* Stvartak was no longer an employee. Docket No. 46 at 10–12. The "arbitrary and capricious" standard applies as agreed by the parties and as determined by the previous order, however this Court makes an alternative determination based on *de novo* review solely for the purposes of assisting the court of appeals on review. *See Firestone Tire & Rubber Company v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989); *Kirwan v. Marriott Corporation,* 10 F.3d 784, 785, 789 (11th Cir.1994) (it is error to apply the arbitrary and capricious standard, rather than de novo standard, where a plan lacks express unambiguous language giving the administrator discretionary authority to determine eligibility for benefits or construe the plan's terms). The result, in this case, is the same under the de novo standard.

denial notice must set forth the specific reasons for the denial, and must be written in a manner calculated to be understood by the participant. 29 U.S.C. § 1133(1); 29 C.F.R. § 2560.503–1(e)–(f). Second, every plan must afford a reasonable opportunity to any participant whose claim has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim. 29 U.S.C. § 1133(2); 29 C.F.R. § 2560.503–1(g). The ·plan description and summary plan description must describe the remedies and procedures available for the redress of denied claims. 29 U.S.C. § 1022(b). Where a plan participant seeks to challenge the denial of benefits, the ERISA statute imposes on the plan participant the burden of showing that he is entitled to the "benefits … under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B); *Farley v. Benefit Trust Life Insurance Company,* 979 F.2d 653, 658 (8th Cir.1992).

## B. The Federal Common Law

The federal courts are charged with developing a body of federal substantive common law of rights and obligations under ERISA-regulated plans. *Firestone Tire & Rubber Company v. Bruch,* 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989). The federal courts fashion common law by interpreting policy language, but are not required to make calculations based on the majority of decisions from other jurisdictions. *Arnold v. Life Insurance Company of North America,* 894 F.2d 1566, 1567 (11th Cir.1990). The nature of the federal action is to equitably enforce the ERISA plan. *Blake v. Unionmutual Stock Life Insurance Co. of America,* 906 F.2d 1525, 1526 (11th Cir.1990).

■ The plan administrator must analyze whether a benefit is payable under the terms of the plan without importing an additional definition or different requirements. *Florence Nightingale Nursing Service, Inc. v. Blue Cross,* 41 F.3d 1476, 1483–84 (11th Cir. 1995) (Blue Cross's Assistant Medical Director and chief claims evaluator never actually analyzed the elements of "medically necessary" listed in the plan, but rather injected a pre-certification definition not mentioned in the plan); *but c.f., Newell v. Prudential Insurance Co. of America,* 904 F.2d 644, 652 (11th Cir.1990) (record did not support charge that administrator's staff psychiatrist used subjective criteria outside of the tests contained in the policy to determine medical necessity).

■ A plan administrator's procedure of having its own employee make medical determinations does not violate ERISA as a matter of law. *Newell,* 904 F.2d at 650, 653–54 (determination of medical necessity in health care plan). The claims administrator of an ERISA-covered plan is not obliged to contact the treating physician, and the district court is not required to give greater weight to the opinion of a treating physician who has an economic interest in the approval of the claim. *Jett v. Blue Cross,* 890 F.2d 1137, 1140 (11th Cir.1989) (health care plan); *but see Godfrey,* 89 F.3d at 758 (physicians acted arbitrarily in rejecting clear medical ·evidence without even examining the disabled plan participant); *Jett,* 890 F.2d at 1141–42 n. 5 (dissent) (Blue Cross gave inadequate reasons for not contacting two treating physicians who expressed professional judgment that hospitalization was necessary).

The Eleventh Circuit recently extended the federal substantive common law to permit an employee to recover long-term disability benefits even though he had failed to exhaust fifty-two weeks of short term sickness benefits. The court of appeals noted that an employee may be totally disabled, yet physically able to show up for work each day by taking potent drugs to mask the severe and debilitating pain. *Godfrey v. BellSouth Telecommunications, Inc.,* 89 F.3d 755, 757, 759 (11th Cir.1996) (affirming district court's finding of disability after arbitrary and capricious denial of LTD benefits).

## C. Ambiguity

■ Ordinary rules of construction require the district court to first assess the natural and plain meaning of the contested language, striving to give meaning to every provision. *Dahl–Eimers v. Mutual of Omaha,* 986 F.2d 1379, 1381–82 (11th Cir.), *cert. denied,* 510 U.S. 964, 114 S.Ct. 440, 126 L.Ed.2d 374 (1993) (non-ERISA case containing instructional· but non-binding sum-

mary of Florida law of ambiguity, and finding the undefined term "experimental" to be ambiguous in the context of a major medical insurance policy). The federal common law requires the district court to give effect to the unambiguous language of the policy when a term has only one possible construction. 894 F.2d at 1567 (no ambiguity in "irrecoverable loss of sight").

A plan is ambiguous, however, when the parties can propose two reasonable interpretations of a plan's language. *Lee v. Blue Cross*, 10 F.3d 1547, 1549–51 (11th Cir.1994) (exclusion pertaining to dental services). In *Lee*, the Eleventh Circuit determined that a health care plan was ambiguous as to whether it excluded orthodontic care given that the parties had proposed two reasonable interpretations of an exclusion. 10 F.3d at 1550–51. The Court reasoned that an insured could not reasonably be expected to know that the plan excluded orthodontic care performed as part of surgery. 10 F.3d at 1550–51. Finding that the plan was ambiguous, the court of appeals applied the rule of *contra proferentum*. Construing the ambiguity against the drafter, the court of appeals found that Blue Cross' interpretation was wrong. 10 F.3d at 1551.

 Silence can create an ambiguity. *Dahl–Eimers v. Mutual of Omaha*, 986 F.2d 1379, 1381–83 (11th Cir.), *cert. denied*, 510 U.S. 964, 114 S.Ct. 440, 126 L.Ed.2d 374 (1993), citing *Davis v. Crown Life Insurance Co.*, 696 F.2d 1343, 1346 (11th Cir.1983) (ambiguity resulting from silence in certificate of insurance which did not include controlling provision recited in master policy). Lastly, the federal common law of equitable estoppel also may apply where a plan administrator orally informs a beneficiary of its interpretation of an ambiguous term. *Kane v. Aetna Life Insurance*, 893 F.2d 1283, 1285 (11th Cir.1990); *accord, National Companies Health Benefit Plan v. St. Joseph's Hospital*, 929 F.2d 1558, 1572 (11th Cir.1991) (plan sponsor estopped to deny continuation coverage).

## IV. FINDINGS OF FACT

### A. Employment History

Kodak employed Stvartak beginning February 12, 1973. PX 34, 36. For the first five years, Stvartak worked as a service engineer in Kodak's Micrographics Division. He then worked for five years in Rochester, N.Y., as a technical sales representative in the Radiography Markets Division (later called the Health Sciences Division). Kodak then transferred Stvartak to Lubbock, Texas, where he served as a technical sales representative selling Kodak x-ray products, film chemicals, and equipment to hospitals. Stvartak held a B.A. degree in mechanical engineering, which he found helpful because his work required technical knowledge. He acted as a factory representative for domestic and overseas field technical representatives, and wrote technical manuals.

### B. Claims Procedures

MetLife normally has no role in the evaluation of STD claims, leaving STD claims for initial review by a Kodak employee's immediate supervisor on learning that the employee is sick. Kodak's Plan Administrator does not become involved in determining STD benefit claims either, although he technically supervises all line supervisors in this regard.

MetLife initially determines all LTD benefit claims. According to Kodak's Plan Administrator, the Plan Administrator "never gets involved in that initial decision." The Administrative Services Agreement ["ASA"] between Kodak and MetLife became effective on January 1, 1985. DX6. Pursuant to the ASA, Kodak's Plan Administrator "delegated to MetLife the authority to construe the terms of the [LTD] Plan to determine whether a Claim is properly payable." DX6 at 4. The Plan Administrator also delegated to MetLife the responsibility to compute and pay benefits, and to notify participants of the denial of claims and the reasons for denial. DX6 at 4, § D, ¶¶ 4–6. The ASA specifies that "MetLife's evaluation of Claims *may* include review by medical professionals ..." DX6 at 4, § D, ¶ 3 (emphasis supplied).[2]

---

**2.** Medical professionals review approximately one half of the LTD claims which MetLife evaluates.

MetLife acts as a co-fiduciary with Kodak under ERISA, and acts in accordance with the terms of the Plan. DX6 at 11–12, § F. Under the ASA, MetLife does not undertake to *review* claims that MetLife has denied. DX6 at 12, § F, ¶ 3. Rather, MetLife provides information and documents to the Plan Administrator to permit full and fair review on appeal of a denied claim. DX6 at 4, § D, ¶ 7.

MetLife also meets certain performance standards regarding the timeliness and accuracy of LTD benefit claims processing. Met-Life's policy is to process 100% of all LTD claims within ten business days, with an accuracy of 99% of benefit dollars paid ( ± 2% statistical sample). DX6 at 24. It is also MetLife's policy that "[n]ew/unexperienced approver's work is totally checked on a daily basis." DX6 at 24.

### C. Medical History

Stvartak's medical records reflect that on August 6, 1985, Dr. B. Kincaid of Lubbock, Texas, diagnosed Stvartak at age 38 with chronic depression. DX14. On October 31, 1989, Gustavo C. Roman, M.D., a diplomate of the American Board of Neurology, performed a neurological evaluation of Stvartak. DX14. Dr. Roman noted that Stvartak had a history of depression for fifteen years or more, which was well controlled with Parnate, Ativan, Stelezine, and Klonopin. Stvartak reported restless, unrefreshing sleep with his "brain racing." DX14.

Between July and November 1989, Dr. S.A. Vahora of Lubbock, Texas, diagnosed Stvartak with major depression in remission, and continued him on Parnate. DX13. On February 9, 1990, Stvartak reported that he was doing well with "no depression" on Klonopin and Parnate. DX13. On February 2, 1990, Stvartak reported to Dr. Vahora that he had "quit" his job, accompanied by a brief dysphoric period. On October 19, 1990, Stvartak reported being "very depressed . . . like a living vegetable," accompanied by "highs" where he feels euphoric and overconfident for up to a week. DX13. Dr. Vahora prescribed Ativan and Lithium. DX13. On December 21, 1990, Stvartak reported that his depression was "terrible." DX13. Dr.

Vahora noted that his thought process had slowed down, and that he was in a continuous and solid depression. DX13. Dr. Vahora increased the dosage of Prozac, and later prescribed Halcion. In June 1990, Stvartak reported that he was back at work, with some dysphoric periods when his wife calls.

On February 29, 1992, Joseph N. DeLuca, M.D., Ph.D. of Longwood, Florida, physically examined Stvartak and took his health history. Dr. DeLuca, who is board certified in medical psychotherapy, was Stvartak's treating physician. DX7. Stvartak's chief complaint was that he was: "totally fatigued, aching muscles and joints, can't sleep easily, want to sleep constantly at times, no ambition, no decision ability, any responsibility causes anxiety, stress, nervousness, lack of ability to function, eat or sleep." DX12. Stvartak reported that "all attempts at working have failed due to deep depression, nervousness, and total physical exhaustion." DX12. Dr. DeLuca's assessment on February 29, 1992 and March 30, 1992 was "anxiety/depression/upper respiratory infection/Chronic Fatigue Immune Deficiency Syndrome ["CFIDS"]." DX12. Dr. DeLuca diagnosed Stvartak with "CFIDS/Depression/Anxiety" on April 27, 1992; on May 26, 1992; on July 20, 1992; on February 1, 1993; on October 11, 1992; and on December 3, 1993. DX12. Stvartak's depression and fatigue increased and decreased over the course of management by Dr. DeLuca through Klonoprin, Ativan, Parnate, Lorazepam, and other medications. DX12.

On October 4, 1993, Dr. DeLuca prepared an Attending Physician's Statement of Functional Capacity on a MetLife form designed to accompany a claim for LTD benefits. DX7. Dr. DeLuca's primary diagnosis affecting work ability was "Chronic Fatigue Syndrome." His secondary diagnosis affecting work ability was "Depression." Dr. De-Luca noted extreme limitations on the many work activities due to Stvartak's medical condition, including auditory attention and written communication. DX7. The MetLife form asked Dr. DeLuca to state whether a past or present psychological problem might interfere with Stvartak's ability to work, and if so, to list his findings according to the

DSM–III [now DSM–IV] multiaxial classification.[3] DX7; PX23, 37. Dr. DeLuca responded "yes, Depression." DX7.

The MetLife form also contained a section requesting Dr. DeLuca's disability evaluation, defining "Totally Disabled" as meaning "totally and continuously unable to engage in any substantial gainful work for which the patient is or becomes appropriately qualified by education, training, or experience." Dr. DeLuca opined that Stvartak was totally disabled both from his own occupation and from any occupation. DX7. Dr. DeLuca informed MetLife that Stvartak's symptoms first appeared in 1985, that Stvartak had a history of depression, and that Stvartak's subjective complaints were extreme fatigue and cognitive deficit. Dr. DeLuca reported objective findings of Beck Depression Inventory and positive Epstein–Barr virus titer. DX7.

On December 3, 1993, Dr. DeLuca responded to questions from MetLife regarding Stvartak's condition over time. Dr. De-Luca listed "severe fatigue," "depression," and "cognitive impairment" as specific limitations affecting Mr. Stvartak's employability. DX12. Dr. DeLuca's explained as follows the change in Stvartak's condition that rendered him unable to work: "Severe debilitating fatigue with cognitive deficits in the area of memory rendering him unable to work from 5/89—Present." DX12. According to Dr. DeLuca, Stvartak's prognosis was "Poor." DX13.

### D. Termination History

Stvartak testified that he was good at his work as a Health Sciences Technical Sales Representative, and enjoyed it until the last two-and-one-half years. The change occurred in 1986, about the time when Kodak replaced the District Manager and the Regional Sales Manager. According to Stvartak, the new Regional Sales Manager, Tom Bedair, wrote his travel reports in a way that made Stvartak believe that Stvartak's work was not good. Stvartak felt additional stress, which made him feel weak and sick much of the time. Stvartak testified that his depression and fatigue was becoming worse, and was no longer controlled by medication. The fatigue, cognitive difficulties (slowed thinking ability and inability to concentrate), and joint and muscle pain became severe. Stvartak also experienced cold sweats, nervousness, anxiety, extreme physical and mental weakness, complete physical exhaustion not refreshed by sleep. Stvartak felt that his mind slowed down to such an extent that it affected his job performance. Stvartak felt that, during the first five months of 1989, he was "not doing as well" as in 1988. Stvartak was nevertheless the division's top salesman in 1988, with gross sales of $3,000,000 to $4,000,000—and a gain of $400,000 over the prior year. Stvartak's testimony was credible.

In November 1987, Bedair told Stvartak that he needed to be more responsive to the needs of his customers, and to establish positive relationships with the decision makers in his accounts. DX28(a). On March 30, 1988, Bedair told Stvartak that he needed to improve his relationships with others, to improve communications (need to effectively listen and understand what is being said to maximize results in his territory), and to improve planning and organization. DX28(a). In May and August 1988, Bedair told Stvartak that it was critical that he improve his interpersonal relations with customers. DX28(a). Bedair placed Stvartak on "Awareness Warning" on November, and outlined eight performance expectations. DX28(a).[4]

3. The Diagnostic and Statistical Manual of Mental Disorders (Fourth Edition) [DSM–IV] is published by the American Psychiatric Association, and has been admitted as PX37. Kodak's first consulting physician, Robert D. Petrie, M.D., agreed that the DSM–IV is authoritative on the diagnostic criteria for mental disorders. Kodak's second consulting physician, Robert C. Porter, M.D., stated that the DSM–IV was "helpful," but not authoritative. Dr. Porter nevertheless testified about mental disorders based on DSM–IV diagnostic criteria.

4. In addition to his doctors, Stvartak discussed his stress with a Kodak employee benefits counselor who arranged for a counseling session with a psychologist. In the Winter of 1988–89, Stvartak also met with the vice president of his division in Rochester to argue that his sales were good, and to "lay out his case."

On March 3, 1989, Tom Bedair issued a "FINAL WARNING" memorandum to Stvartak due to lack of significant improvement, which Stvartak signed on March 6, 1989. DX28(a). Bedair told Stvartak that customer relations is a basic and significant part of his job as a Technical Sales Representative, and that his primary concern was Stvartak's inability to satisfy customer needs. DX28(a) at 2, 4. Failure to achieve and sustain Bedair's minimum performance expectations by timely handling all customer requests, avoiding any unfavorable customer complaint or reaction, and refraining from comments about his personnel status would be grounds for Stvartak's immediate termination. DX28(a) at 2, 4.

According to Stvartak, he last worked on Wednesday, May 17, 1989. Thieves had stolen Kodak material from Stvartak in Amarillo, Texas, and Stvartak spent the day on May 17 waiting in the motel to fill out the police reports. Stvartak told Tom Bedair that he felt sick and could not drive to meet Bedair in Lubbock, Texas. On the morning of Thursday, May 18, 1989, Stvartak went to Bedair's motel room and met Bedair and a Kodak employee benefits person named Jerry Bremer. Stvartak told Bedair and Bremer that he was sick, but wanted to continue working for Kodak. Stvartak testified that Bedair told him that he could not go on sick leave because they were "laying him off" tomorrow at the end of the Friday work day [Friday, May 19, 1989]. According to Stvartak, Bedair and Bremer wanted him to sign papers, although he felt too sick to think. At the time, he was taking Parnate, Stelezine, and Atavan. Stvartak was still sick on Friday, May 19, 1989, and did not work.

According to Stvartak, Kodak thereafter paid him monthly for six months for "termination pay for lay off," and he still receives employee welfare pension plan benefits from Kodak. According to Kodak's payroll department records, Stvartak received $5,656 in "Vacation-in Lieu," and received $808 per week in separation payments for twenty-three weeks beginning June 9, 1989. PX34. Kodak's payroll department records show that Stvartak retired on Saturday, May 20, 1989. PX34.

Stvartak worked at MedPay Inc. selling computers from April 16, 1990 to July 10, 1990, and at Management Recruiters as a "headhunter" for engineers from April 1, 1991 to July 3, 1991. He was unable to work longer than three months at either employment due to recurrence of depression and fatigue.

### E. Review of Claim

As required by the Kodak LTD Plan, DX3 at 7, Stvartak applied for Social Security disability benefits, and reapplied three times until the Social Security Administration approved benefits. On July 17, 1992, the Honorable Howard J. Goren, Administrative Law Judge, found Stvartak disabled due to depression, and awarded disability benefits under the Social Security statutes and regulations.[5] PX27; DX8.

On June 16, 1993, Stvartak's attorney, Harvey M. Alper, wrote to the Kodak Long Term Disability Plan and MetLife demanding payment of LTD benefits from the LTD Plan, and STD benefits from the STD Plan. PX26; DX17. Kodak's Customer Services Department forwarded the demand letter to one of Kodak's Benefits Counselors under the supervision of David E. Edwards. DX25. Benefits Counselor Katherine E. Dexter sent Alper a MetLife LTD application, and directed Alper to have Stvartak and his physician complete and return the application to her in a pre-addressed envelope. PX23. Dexter did not direct Stvartak to do anything further regarding his demand for STD benefits.[6]

Dr. DeLuca signed the physician's statement on October 4, 1993, and Stvartak signed the LTD claim form on October 11, 1993.

---

**5.** The Social Security statutes and regulations are not applicable to the Plan Administrator's determination of Stvartak's claim, and the ALJ's finding of disability is not binding on Kodak. On the other hand, the Plan Administrator is not prohibited from considering the ALJ's determination that Stvartak was disabled.

**6.** Indeed, an employee's immediate supervisor normally approves or denies STD benefits on learning that the employee requests sick leave. The Employee Benefits Department and David E. Edwards are not involved.

DX7. As directed, Alper mailed the completed claim to Katherine E. Dexter. PX22; DX7. Dexter signed the Statement of Employer on behalf of Kodak on October 18, 1993. DX7. Dexter slashed through the portion of the Statement of Employer that seeks a response to the question "[p]lease list all other items which, as provided under your plan, will reduce the amount of LTD benefits." DX7; PX23.

MetLife's Disability Management Services Unit received Stvartak's completed LTD claim directly from the Kodak Employee Benefit Department. Frank Zito, Unit Manager, supervised some fourteen Disability Management Specialists at MetLife. Kim Cahill was a Senior Disability Management Specialist. Connie Kemler was a Disability Management Specialist. Both were under Frank Zito's supervision. Neither Zito nor Cahill nor Kemler were experts in any medical field, but they all were experts in processing disability claims.

Kemler wrote to Alper to request additional facts on Stvartak's medical condition. DX10, 11. Alper sent the medical records on December 9, 1993. Kemler sought and obtained from Alper the reason Stvartak waited four years to submit his claim, DX15, 16, and MetLife and Kodak agreed that there were extenuating circumstances to excuse the delay.

On June 2, 1994, Disability Management Specialist Kemler advised Alper in writing[7] that "Mr. Stvartak's claim for Long Term Disability has been approved for payment. At this time we are awaiting additional information from Kodak in order to process this payment." DX18; PX19. Kemler requested Stvartak to complete a Form W-4 because the benefit would be taxable, which he did. DX18. Senior Management Specialist Cahill agreed with Kemler's determination of disability. DX27. Unit Manager Frank Zito reviewed the decision because Kodak had an interest in the claim. DX27. Zito also agreed with Kemler's and Cahill's determination of disability. Kathy Dexter at Kodak knew on May 20, 1994 that MetLife was approving Stvartak's application for LTD benefits, and asked Frank Zito for a copy of the approval letter. DX27.

Kodak's legal department and Employee Benefits department then caused MetLife to delay the payment of Stvartak's LTD claim pending further review. Nancy Blase was a Disability Management Specialist at MetLife. On July 1, 1994, August 19, 1994, and September 16, 1994, Blase wrote to Alper that MetLife could not proceed to process Stvartak's LTD claim until Kodak furnished MetLife with the date Stvartak's STD benefits expired. PX14, 16; DX20. After three letters from Alper to Blase (at MetLife) and Dexter (at Kodak Employee Benefits), PX10–13, Blase responded on November 16, 1994 that MetLife and Kodak were still investigating the STD benefits issue. PX9. On December 21, 1994, Blase wrote to Alper that MetLife was unable to consider Stvartak's LTD benefit claim at that time because Kodak was still investigating his STD benefits. Blase stated: "Once a decision is rendered by Kodak concerning the Short Term Disability benefits, the Long Term Disability claim will be considered." DX21. On February 14, 1995, Blase wrote to Alper that Kodak was still reviewing Stvartak's STD claim, and "[u]ntil this matter has been resolved his [LTD] claim must remain on [sic] a pending status." DX24.

Blase again wrote to Alper on March 22, 1995. DX25. **Although MetLife had never issued a letter denying Stvartak's LTD claim,** Blase wrote that the "next appropriate step would be to file an appeal with the Plan Administrator at Kodak." DX25.[8] Blase referred any questions to John T. Purves, Esq., Kodak's in-house counsel. DX25. Essentially, Kodak's Plan Administrator would personally make the initial determination of Stvartak's LTD claim.

Stvartak then commenced this action. The parties agreed to abate the action to permit

---

7. Kemler had earlier advised Alper of the approval by telephone. Alper responded by letter dated May 26, 1994 to Kemler, and reminded her that Stvartak had also demanded fifty-two weeks of STD benefits. DX19.

8. Appeals from the denial of LTD benefits are made to the Plan Administrator. DX3 at 12; DX1 at 172–73.

Stvartak to "appeal" to the Plan Administrator, although there had not yet been a denial of the claim within the meaning of 29 U.S.C. § 1133(1). On August 16, 1995, David E. Edwards, Director of Benefits and Plan Administrator, wrote to Alper denying Stvartak's claim for STD and LTD benefits. DX26. Regarding STD benefits, Edwards found no causal connection between Stvartak's alleged disability and the termination of his employment, and no indication that Stvartak suffered from a disabling illness in the months prior to termination. DX26. Regarding LTD benefits, Edwards first reasoned that Stvartak's condition had not caused his STD benefit to "run out." DX26 at 2. Second, Edwards reasoned that there was no medical information which *objectively* substantiated Stvartak's claim that he is disabled due to chronic fatigue syndrome and severe depression. DX26.

### F. Kodak's Consulting Medical Experts

At Kodak's request before the Plan Administrator evaluated Stvartak's claim, Met-Life arranged for two physicians from National Medical Review to review Stvartak's medical records. DX12–14. MetLife asked them to determine whether Stvartak was totally disabled from his employment as a Technical Sales representative during the six-month period from May 19, 1989 through November 19, 1989. The review was to assist the Plan Administrator in assessing Stvartak's eligibility for STD.

Robert D. Petrie, M.D., F.A.C.P.M., is Chief of Occupational Medicine at the Virginia Mason Clinic in Seattle, Washington. He is board certified in Family Practice and Occupational Medicine. Robert C. Porter, M.D., F.A.C.P.M., F.A.A.D.E.P., is Director and Chairman of Occupational and Emergency Medicine, and oversees the Trauma Center, at the Swedish American Hospital in Rockford, Illinois. He is board certified in Occupational Medicine, Emergency Medicine, and Family Practice. Both physicians con-

cluded that Stvartak was not totally disabled due to chronic fatigue syndrome and depression. DX22, 23.

Both Dr. Petrie and Dr. Porter applied the diagnostic criteria for chronic fatigue syndrome found in the *Annals of Internal Medicine*.[9] DX22 at 5. Chronic fatigue is defined as "self-reported persistent or relapsing fatigue lasting 6 or more consecutive months." DX29 at 954. The diagnosis of chronic fatigue syndrome can be made only after alternative medical and psychiatric causes of chronic fatigue have been excluded. DX29 at 953. The following conditions exclude a patient from the diagnosis of unexplained chronic fatigue: "[a]ny past or current diagnosis of a major depressive disorder with psychotic or melancholic features; bipolar affective disorders . . ." DX29 at 955. The *Annals* article notes the difficulty of interpreting symptoms of chronic fatigue syndrome in the setting of major psychotic depression, and distinguishes lesser psychiatric disorders:

> On the other hand, we did not use other psychiatric disorders, such as anxiety disorders and less severe forms of depression, as a basis for exclusion. Such psychiatric conditions are highly prevalent in persons with chronic fatigue and the chronic fatigue syndrome, and the exclusion of persons with these conditions would substantially hinder efforts to clarify the role that psychiatric disorders have in fatiguing illnesses. This is a particularly important issue to resolve.

DX29 at 957.

Applying the Center for Disease Control's criteria, both Dr. Petrie and Dr. Porter determined that Stvartak's record of depression precluded the diagnosis of chronic fatigue syndrome. Dr. Robert D. Petrie testified that Stvartak had a severe and fluctuating depression over eight years consistent with the CDC guidelines, ruling out a diagnosis of chronic fatigue syndrome. Fatigue and anxiety are associated with the

---

9. The reprint of "The Chronic Fatigue Syndrome: A Comprehensive Approach to Its Definition and Study," *Annals of Internal Medicine,* Volume 121, No. 12 (December 15, 1994), an article by physicians at the Center for Disease Control and Prevention, is admitted as DX29. The reprint proposes a conceptual framework for the clinical evaluation of fatigued persons, and a case definition of the chronic fatigue syndrome.

depression. Dr. Petrie acknowledged that Stvartak's depression was not well controlled over part of the eight-year period, and that it is possible that Stvartak suffered from chronic fatigue syndrome, but continued to work.

Dr. Robert C. Porter concluded that Stvartak's medical records showed that Stvartak suffered from a major depression, which was endogenous (coming from the inside) and probably related to a chemical imbalance. Fatigue, cognitive deficits, and anxiety were all consistent with Stvartak's depression. According to Dr. Porter, Stvartak's major depression had a typical fluctuating course, but the depression was controlled by drugs, and therefore in remission. According to Dr. Porter, the fluctuations did not destroy Stvartak's capacity to perform his job at Kodak. Dr. Porter acknowledged, nevertheless, that the following could be consistent with depression: lack of responsiveness to the needs of customers; failure to develop positive relationships with others; and failures of communication, listening, and understanding.

Dr. Porter correctly noted that there is a difference between a major depressive episode and a major depression (i.e., a "major depressive disorder") within the DSM–IV and CDC criteria. *See* PX37; DX39. The diagnosis of a major depressive disorder, however, requires the presence of two or more major depressive episodes. PX37 at 345. Dr. Porter testified on cross examination by the plaintiff that Stvartak had at least one major depressive episode at some time in the past, but also testified on redirect by Kodak that the record does not support Stvartak having had a major depressive episode. In any event, both Dr. Petrie and Dr. Porter agree that Stvartak had a "past or current diagnosis of major depressive disorder with psychotic or melancholic features" and possible bipolar disorder. DX29 at 955. Dr. Porter noted that Stvartak's doctors had treated him with anti-psychotic medication for psychotic features, and with lithium for bipolar disorder. DX13. Dr. Porter testified that Stvartak's major depressive disorder remains in remission, but that Stvartak will carry that diagnosis the rest of his life.

## V. ANALYSIS

 After reviewing the Plan Administrator's interpretation of the STD Plan and the LTD Plan from the perspective of de novo review, *see Godfrey*, 89 F.3d at 758; *Lee*, 10 F.3d at 1550, 1551 n. 3, the Court disagrees with the Plan Administrator's interpretation of the LTD Plan that a participant is ineligible to receive LTD benefits if Kodak terminates his employment before paying him all fifty-two weeks of STD benefits.

Beginning in 1980, David E. Edwards, Kodak's Plan Administrator [then an Employee Benefits Specialist], had responsibility for drafting the LTD Plan documents. In July 1987, Edwards revised and had printed the summary plan description. DX1 at 185 (1987 SPD). The 1987 SPD regarding qualification for LTD benefits provides:

> To qualify for LTD benefits: 1) you must be totally and continuously unable to engage in any substantial gainful work for which you are, or become, reasonable qualified by education, training, or experience, **and 2) your disability must cause your short-term disability benefit to run out** and must be expected to last for a period of at least six months from the date the disability began (or the disability must be expected to result in death).

DX1 at 132 (emphasis supplied). During the formulation of the LTD Plan, Edwards recalls inserting the phrase "your disability must cause your short-term disability benefit to run out" so as to require an employee to receive a full fifty-two week STD allotment before becoming eligible for LTD benefits. Kodak relies heavily on the language "must cause your short-term disability to run out" in denying LTD benefits to Stvartak.

The 1987 SPD, however, states that "the plan document serves as the final authority in all matters relating to plan interpretation." DX1 at 178. The controlling LTD plan document, however, does not contain the same language as the 1987 SPD requiring the disability to cause the STD benefit to "run out."

Before Stvartak's termination, Kodak last revised the LTD Plan on June 13, 1988.

DX3. To qualify for LTD payments under that plan, a participant must do nothing more than meet the definition of "disability," and also meet six other requirements. DX3 at 6, § 4.01. The six requirements do not require the exhaustion of STD benefits, and do not require STD benefits to "run out." A participant may therefore *qualify* for LTD benefits under the LTD Plan without reference to his STD status. A participant who *qualifies* for LTD payments, then looks to § 4.02, DX3 at 7, to determine when his payments will start. The LTD benefit is payable beginning with the "Effective Date of LTD" if the LTD claim is approved. DX3 at 7.

The controlling language in the LTD Plan is as follows: " 'Effective Date of LTD' is the first date following the *expiration* of Short–Term Disability benefits for which a claim for LTD payments is approved." DX3 at 2, § 2.07 (emphasis supplied).[10] The plan is silent as to the definition of "expiration." Kodak argues that "expiration" can only occur when Kodak has paid all fifty-two weeks of STD benefits, but not when Kodak terminates an employee's employment short of full payment. In other words, Kodak argues that LTD payments will never start for some participants who *qualify* for LTD payments.

Nothing in the STD Plan or LTD Plan requires the Plan Administrator's narrow interpretation of the language. Under the Plan Administrator's interpretation, the LTD plan participants at Kodak cannot reasonably be expected to know that the LTD Plan does not cover them if they decide not to take sick leave (STD benefits), if their employment ends before they take sick leave, or if they fail to fully exhaust their sick leave. Indeed, the Plan Administrator acknowledged at trial that a plan participant would have to ask the Employee Benefits department in order to find out.

Stvartak has proposed a sound interpretation of the plan to rival Kodak's interpretation. Stvartak proposes that STD benefits expire when a participant's employment terminates. Section 6.02 of the STD Plan (incorporated into the LTD Plan in § 2.20) supports Stvartak's interpretation: "[a]n employee's coverage under the Plan terminates when his employment terminates." DX4 at 12; DX3 at 5, § 2.20. The Court finds that the LTD plan is at best ambiguous because the parties have proposed two reasonable interpretations of the plan language. The rule of *contra proferentum* applies. Construing the ambiguity against the drafter (the Plan Administrator), the Plan Administrator's interpretation is incorrect.[11]

Stvartak's STD coverage terminated when his employment terminated on Friday, May 19, 1989 at 5:00 p.m.—one and one half days after Tom Bedair and Jerry Bremer approved his STD benefits. If Stvartak also meets the definition of "Disability" under Section 2.06 of the LTD Plan, Stvartak's "Effective Date of LTD" is Saturday, May 20, 1989. DX3 at 2, 6.

Because the Plan Administrator's interpretation of the plan language is legally incorrect, the Court next evaluates the self-interest of the fiduciary. Stvartak has demonstrated a conflict of interest on the part of the Plan Administrator responsible for benefits determinations. The conflict of interest implies no misfeasance by the Plan Administrator. Rather, the conflict is inherent where a corporate benefits director determines or reviews a claim made on an unfunded employee welfare benefit plan. The Plan Administrator necessarily has mixed motives in exercising his power to interpret the plans. He must act solely in the best interest of the plan participants in construing and administering the plans, and must also act in the best interests of Ko-

---

10. On April 14, 1991, Kodak again revised the LTD Plan. DX5. Although the revision changed the definition of the "Effective Date of LTD," the post-termination revision does not apply to Stvartak's claim.

11. In light of the above findings, the Court need not decide whether the federal common law of equitable estoppel prevents Kodak's Plan Administrator from denying Stvartak LTD benefits where the Plan Administrator's delegee and agent for processing claims originally agreed with Stvartak in his interpretation of an ambiguous term, and approved his LTD claim in writing. *See Kane v. Aetna Life Insurance*, 893 F.2d 1283, 1285 (11th Cir.1990); *accord, National Companies Health Benefit Plan v. St. Joseph's Hospital*, 929 F.2d 1558, 1572 (11th Cir.1991). The parties have not briefed this issue.

dak's shareholders and directors in preserving retained earnings. The Benefits Director serves at the direction of the Board of Directors, and obtains legal advice on ERISA matters from in-house counsel representing the interests of the corporation and its shareholders. To this extent, the interests of the Plan Administrator inherently conflict with those of the plan participants.

The burden then shifts to Kodak to prove that its interpretation of the plan was not affected by self-interest. Kodak's incorrect but arguably reasonable interpretation advances Kodak's conflicting interest at the expense of the affected beneficiary or beneficiaries. Kodak has not succeeded in justifying its own interpretation on the ground of its benefit to the class of all participants. The LTD Plan is unfunded. Neither the denial of a chronic fatigue syndrome claim, nor the interpretation of the plan to preclude LTD payments, is directly aimed at preserving assets for other participants in the Kodak Welfare Benefit Plan Trust.[12]

Under the LTD Plan, a participant is disabled if he is "totally and continuously unable to engage in any substantial Gainful Work for which he is, or becomes, reasonably qualified by education, training, or experience, and ... [t]he disability ... can be reasonably expected to last for a total of at least 26 weeks ..." DX3 at 2. Under the April 1, 1989 STD Plan, "disability" means the inability, as a result of pregnancy, illness or injury, to perform regular and customary duties (or any other duties that Kodak may offer).

DX4 at 2. Essentially, STD benefits are "sick leave." [13]

The evidence proves that Stvartak's major depressive disorder was severe and disabling. The Court agrees with the conclusions of the following people that Stvartak suffered from a long-term disability: 1.) Joseph N. DeLuca, M.D., Ph.D. (board certified in medical psychotherapy); 2.) MetLife Disability Case Management Specialist Connie Kemler; 3.) MetLife Senior Disability Case Management Specialist Kim Cahill; 4.) MetLife Disability Unit Manager Frank Zito; and 5.) The Honorable Howard J. Goren, Administrative Law Judge. The Court also agrees with the conclusions of the following consulting physicians that Stvartak suffered from "a major depressive disorder with psychotic or melancholic features" and possible bipolar disorder: 1.) Robert D. Petrie, M.D.; and 2.) Robert C. Porter, M.D. Stvartak provided the Plan Administrator with ample evidence of his disability, including medical records from several treating physicians, DX12–14, and an Attending Physician's Statement of Functional Capacity prepared by a treating physician board certified in medical psychotherapy. DX7.

According to the DSM–IV, major depressive disorder is a severe and debilitating mental disorder. See PX37 at 339–45, 382–86, 320–27. Stvartak was totally disabled from his major depressive disorder, yet physically able to show up for work each day by taking potent anti-depressant and anti-psychotic drugs to overcome his severe and de-

---

**12.** In addition to conflict of interest, the Court has considered each of the other common law factors for measuring abuse of discretion in the administration of a trust. The purpose of the LTD Plan was to provide LTD benefits to disabled Kodak employees, but not to employees who can work. The nature of the Plan Administrator's undelegated power was to review the *denial* of LTD benefits by the claims administrator, and to assure that initial and appellate review of LTD claims comported with the language of the LTD Plan. No party has cited authority prohibiting the Plan Administrator from conducting the initial determination of a particular LTD claim in which he has an interest, as he did here. Nevertheless, the Court may consider the reasons that the Plan Administrator might revoke delegated authority and himself initially decide a particular LTD claim that MetLife had already

allowed, and also to decide an STD claim that is normally determined by a field supervisor. There does exist an external standard—although indefinite and far from controlling—by which the reasonableness of the Plan Administrator's conduct can be judged regarding the medical assessment of disability: the extent to which the Plan Administrator's assessment of medical disability comports with others skilled in determining LTD claims.

**13.** The STD Plan continues an employee's pay during absence from work because of his inability to work. DX4 at 1. An employee's coverage under the STD Plan terminates when his employment terminates. DX4 at 12, § 6.02. The payment of STD benefits also terminates when his employment terminates. DX4 at 12, § 6.01.

**1546**

bilitating depression and fatigue. However, Stvartak's depression adversely affected his ability to satisfy customer needs; to maintain relationships with others; to communicate, listen, and understand what is being said so as to maximize results in his territory. DX28(a). In May and August 1988, Stvartak was unable to comply with Bedair's admonition that it was critical that he improve his interpersonal relations with customers because of his major depressive disorder. DX28(a).

## VI. ATTORNEYS FEES

■ In any action by a plan participant, the Court in its discretion may allow a reasonable attorney's fee and costs of action to either party. 29 U.S.C. § 1132(g)(1). The law provides no presumption in favor of granting attorney's fees to a prevailing claimant in an ERISA action. *Florence Nightingale Nursing Service, Inc. v. Blue Cross,* 41 F.3d 1476, 1485 (11th Cir.1995). In deciding whether to award attorneys fees under ERISA, the district court must consider (but need not discuss) the following factors, no one of which is dispositive, and some of which may not apply in a given case:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Florence Nightingale Nursing Service, Inc. v. Blue Cross,* 41 F.3d 1476, 1485 (11th Cir. 1995); *National Companies Health Benefit Plan v. St. Joseph's Hospital,* 929 F.2d 1558, 1575 (11th Cir.1991). In *Florence Nightingale,* the Eleventh Circuit found that Blue Cross had not acted in bad faith because it clearly had an arguable basis for its decision. 41 F.3d at 1485. In *National Companies,* the Eleventh Circuit found that the deterrent value of awarding attorney's fees was high.

The Court reasoned that plan sponsors might force underfinanced beneficiaries to sue them to receive their benefits, or instead accept undervalued settlements, if the plan sponsor had little to lose but the amount it should have paid without litigation. 929 F.2d at 1575–76.

■ The Court exercises its discretion to allow a reasonable attorney's fee and costs to Stvartak pursuant to 29 U.S.C. § 1132(g)(1). The district court has considered several factors. Kodak's Plan Administrator did not act with bad faith in denying the claim, although his actions were more consistent with Kodak's own financial interest than with the interests of the plan participants. The Court understands the argument that a plan administrator is obliged to carefully screen payments under existing plans to assure the uniform treatment of all plan participants. Kodak's asserted motivation to assure an interpretation consistent with past decisions played little if any role in the denial of Stvartak's claim.

Kodak had an arguable basis for denial under Kodak's reading of the LTD Plan, and decided to assume the risk of litigation costs and attorneys fees by denying the claim in light of the plan's ambiguity. This preserved Kodak's ability to deny similar chronic fatigue syndrome claims, if any, and to put any future claimants to the expensive test of litigation. Kodak is well able to satisfy an award of attorneys' fees. An award of attorneys' fees against Kodak may somewhat deter Plan Administrators responsible for unfunded welfare benefit plans from denying similar claims for major depressive disorder, but this factor is not significant in awarding fees.

The deterrent value of awarding attorney's fees is high. With little to lose but the amount that should have been paid without litigation, Kodak and other companies might be encouraged to force beneficiaries to sue them to receive their benefits. Kodak stated that it never settles claims, but rather accepts the risk of litigating them. Kodak articulated no real benefit to all participants and beneficiaries of the ERISA plan from its denial of Stvartak's claim. Stvartak did not seek to resolve a significant legal question

regarding ERISA itself. For the reasons stated in this opinion, the relative merits of the parties' positions weigh heavily in favor of awarding a reasonable attorneys' fee to Stvartak.

## VII. CONCLUSION

Plaintiff Stvartak has met his burden of showing that he is entitled "to recover benefits due to him under the terms of his plan" within the meaning of 29 U.S.C. § 1132(a)(1)(B).[14] The Plan Administrator adopted a legally incorrect interpretation of the LTD Plan so as to deny LTD benefits to a qualified plan participant. The Plan Administrator abused his discretion in discounting the medical evidence of Stvartak's major depressive disorder and fatigue, in discounting the effects of the Stvartak's depression and fatigue on his ability to perform work for Kodak as expected, and in discounting the effects of the potent anti-depressant and anti-psychotic medication that Stvartak took on a daily basis to remain at work. *See Godfrey,* 89 F.3d at 759. The Plan Administrator's decision to deny LTD benefits, therefore, was arbitrary and capricious.

The Clerk shall enter judgment for plaintiff Ronald S. Stvartak and against defendant Eastman Kodak Company for the payment of long term disability benefits under the Kodak Long–Term Disability Plan beginning May 20, 1989, together with a reasonable attorneys' fee and costs of the action pursuant to 29 U.S.C. § 1132(g)(1), to be taxed on motion and bill of costs if not resolved by the parties.

14. As an alternative finding based on de novo review, Stvartak is entitled to a declaration that he is entitled to the payment of LTD benefits pursuant to the LTD Plan.