**Rosemary R. RICHARDS, Plaintiff.**

v.

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY and Fidelity National Financial, Inc. Defendants.**

**Nos. 03–81066–CIV–RYSKAMP, 03–81066–CIV–VITUNAC.**

United States District Court, S.D. Florida.

Dec. 1, 2004.

Stewart Lee Karlin, Fort Lauderdale, FL, for Rosemary R. Richards, plaintiff.

William Joseph Gallwey, III, Shutts & Bowen, Miami, FL, for Hartford Life and Accident Insurance Company, Fidelity National Financial Inc., defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

RYSKAMP, District Judge.

THIS CAUSE comes before the Court pursuant to the parties' cross-motions for summary judgment. Hartford Life and Accident Insurance Company and Fidelity National Financial, Inc. ("Hartford" and "Fidelity"; collectively "Defendants") moved for summary judgment on September 16, 2004 [DE 33]. Rosemary Richards ("Plaintiff") moved for summary judgment on September 28, 2004 [DE 38]. The Court heard oral argument on these motions on November 17, 2004. These motions are ripe for adjudication.

### I. BACKGROUND

Plaintiff brings this action pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 based on Hartford's denial of her claim for long term disability benefits under policyholder Fidelity's ERISA welfare benefit plan. (Compl.¶¶ 6, 9.) Fidelity employed Plaintiff as a title examiner from April 9, 1999 through October 8, 2002. (Administrative Record, "A.R." 373.) According to the Policy,

> **Disability or Disabled** means that during the Elimination Period and for the next 24 months you are prevented by:
>
> 1. accidental body injury;
> 2. sickness;
> 3. Mental Illness;
> 4. Substance Abuse; or
> 5. pregnancy,
>
> from performing one or more of the Essential Duties of Your Occupation....After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation.

(Ex. A. at 15.) The Policy defines "Your Occupation" as "your occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job you are performing for a specific employer or at a specific location." (Ex. A. at 17.) Hartford based its decision to deny benefits on the following definition of the position of title examiner:

The job description and key responsibilities of the Title Examiner position are to proofread and ensure accuracy of all work processing work including but not limited to correct book and page information. Review of all title orders over your authorized level with an underwriter. Assist customers, agents and employees with various title problems and/or concerns as they arise in a courteous and friendly manner. Search, examine and review all title work to ensure compliance with customers instructions applicable state, company guidelines and/or the transactions structure and intent. Prepare policies and endorsements for direct non-escrow orders. Review of new files within 24 hours of receiving to ascertain if any information is needed from customer in order to examine the property. Call customer as soon as possible if order cannot be completed by the time it is needed, cost will exceed our normal charge or any other serious issues. Search and examine complex titles, often without help of prior title evidence, in such a manner that claims are minimized.

(A.R.220–21.) The Department of Labor rates the level of physical exertion an occupation requires according to five categories: sedentary, light, medium, heavy and very heavy. (A.R.113.) Hartford classified the position of "title examiner" as sedentary. See A.R. 79 ("[Plaintiff] was working in a sedentary exertion-level occupation as a Title Examiner"); A.R. 113 (classifying Plaintiff's job as "sedentary" according to Department of Labor cate-gorization scheme). The Department of Labor's Dictionary of Occupational Titles defines sedentary work as requiring exertion of "up to 10 pounds of force occasionally . . . and/or a negligible amount of force frequently . . . to lift, carry, push, pull, or otherwise move objects." *Lopes v. Metropolitan Life Ins. Co.*, 332 F.3d 1, 3 (1st Cir.2003). The Policy gave Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms" of the Policy. (Ex. A. at 14.)

Plaintiff began experiencing severe shoulder pain and tingling in her left arm in 1985. (A.R.416.) These symptoms dissipated, but Plaintiff continued to have periodic bouts of shoulder, hand and arm pain. *Id.* Plaintiff was involved in a car accident in December of 1995, after which she noticed tingling in her right upper thigh. (A.R.87, 416.) In 1997, while bending over, Plaintiff heard a "pop" and felt pain in her neck. (A.R.416.) Plaintiff had a C4–5 cervical fusion in 1998. In 1999, Plaintiff slipped and fell in a restaurant. In May of 2000, Plaintiff began experiencing a tingling sensation in the right side of her face. *Id.* In May of 2001, Plaintiff walked into a sliding glass door, lacerated her nose and fell backwards onto a pool table, hitting her head. (A.R.393). In July of 2001, Plaintiff sought the care of neurologist Paul Elliott, D.O. ("Dr.Elliott"), complaining of headaches and "all sorts of pain-type conditions." *Id.* Dr. Elliott noted that Plaintiff may be suffering from Multiple Sclerosis ("MS"), but that previous physicians Plaintiff had consulted believed that Plaintiff's problems related to her cervical spine. *Id.* In April of 2002, Plaintiff experienced pain and foggy vision in her right eye. (A.R.416.) Plaintiff experienced pain in both eyes in May of 2002. In June of 2002, Plaintiff again experienced pain and foggy vision in her right eye. *Id.* In July of 2002. Plaintiff

experienced left arm pain and began to feel fatigued. *Id.*

Plaintiff ceased work on July 12, 2002. complaining of neck and back arthritis, herniated discs and possible MS. Plaintiff claimed to have difficulty concentrating, writing and keyboarding. (A.R.79.) Plaintiff applied for and received short term disability benefits. (A.R.308.) In support of her application for short term benefits, Plaintiff enclosed an August 9, 2002 statement from Dr. Elliott showing that Plaintiff's subjective symptoms consisted of chronic pain, intermittent blurred vision, confusion and depression. (A.R. 434.) Dr. Elliott made a primary diagnosis of MS and secondary diagnoses of cervical herniated nucleus pulposis, hypertension and fibromyalgia. (A.R.373, 454, 368, 434–35.) Dr. Elliott's statement also indicated that two MRIs of Plaintiff's brain showed that Plaintiff suffered from demyelinating disease. (A.R.434.) As to physical restrictions, Dr. Elliott believed that Plaintiff could stand for two hours with a 15 minute break, walk for two hours with a 15 minute break, lift or push 10 pounds and sit for indefinite periods of time. Dr. Elliott believed that Plaintiff could drive as long as she was not experiencing blurred vision. Nevertheless, he cautioned that Plaintiff should avoid reaching over her head and should avoid activities involving repetitive motion. (A.R.434–35.)

Plaintiff's short term benefits expired on September 15, 2002. (A.R. 308.) On December 30, 2002. Plaintiff applied for long term disability benefits based on the same reported conditions. (A.R. 316.) The medical records submitted in support of her request indicated as follows:

- In October of 2002, Plaintiff was twice examined by neurologist Brian Steingo, M.D. ("Dr.Steingo") at the Multiple Sclerosis Clinic of the North Ridge Neuroscience Center in Fort Lauderdale, Florida. MRIs indicated "non-specific" findings that were "not classical for multiple sclerosis." (A.R.415.) Dr. Steingo reported that Plaintiff's symptoms were "fluctuating," "not classical in the sense of an [sic] multiple sclerosis relapse, in that some of the symptoms only lasted for a few hours and by definition a relapse should be at least 24 hours," and that he "[could] not make the diagnosis of multiple sclerosis at this point." (A.R. 417, 419.)

- An October 22, 2002 MRI of Plaintiff's lumbar spine indicated mild degenerative changes and a clinical diagnosis of lower back pain, but no enhancing masses. The clinical diagnosis was lower back pain. (A.R.312.)

- On November 14, 2002, Dr. Elliott completed a Physical Capacities Evaluation Form ("PCE") on Plaintiff, noting that Plaintiff was capable of sitting for two hours, standing for two hours and walking for two hours when her condition was not exacerbated. The PCE also stated that Plaintiff was capable of lifting and carrying ten pounds, but should avoid repetitive motion. Plaintiff suffered from blurred vision, chronic pain, depression and intermittent confusion. (A.R. 319–20.)

- On February 26, 2003. when asked whether Plaintiff could work part time, psychologist Gilda Broadwell, Ph.D., who had been treating Plaintiff for depression, advised that Plaintiff's "present level of Depression would not limit her from working." (A.R. 64.)

On February 26, 2003, Hartford determined that Plaintiff was capable of returning to work as a title examiner and denied her claim for long term disability benefits. (A.R.219–21.)

Plaintiff filed an administrative appeal of the denial on August 2, 2003. (A.R.208).

As part of her appellate materials, Plaintiff enclosed an update letter from Dr. Elliott in which Dr. Elliott reaffirmed that Plaintiff "suffers from chronic pain and has limited work abilities" and suffers from blurred vision. (A.R.214.) Dr. Elliott also explained that Plaintiff was experiencing stress due to her husband's health problems and that Plaintiff was hospitalized at Savannas Hospital in May of 2003 after attempting suicide. *Id.* Dr. Elliott concluded that Plaintiff "is unable to work in a full-time capacity"; . . . . is unable to perform every-day-work and cannot maintain and [sic] 8 to 5, 40 hour work-week. *Id.* Plaintiff's counsel's letter to Hartford identified Dr. Elliott as Plaintiff's "personal physician," stated that Dr. Elliott was "inherently most familiar with [Plaintiff]" and that Dr. Elliott's opinions were "entitled to the highest deference." (A.R.213.)

Plaintiff also provided Hartford with treatment records from ophthalmologist Richard Kadingo, M.D. ("Dr.Kadingo") and treatment records from her stay at Savannas Hospital. Plaintiff was in Dr. Kadingo's care from May 6, 2002 through July 23, 2003. (A.R.118, 138.) Dr. Kadingo's initial evaluation of Plaintiff indicated that Plaintiff had normal vision fields and visual acuity of 20/20 or 20/25. (A.R.111, 118.) Dr. Kadingo did not note any changes in Plaintiff's eyes during the time he treated her. (A.R.104.) Although Plaintiff may have been suffering from antiphospholipid antibody syndrome, which mimics MS and can cause "transient episodes of visual obscuration . . . lasting for brief periods of time," Dr. Kadingo was not able to pinpoint the cause of Plaintiff's eye pain. (A.R.93, 104, 107.)

Plaintiff's records from Savannas Hospital indicate that she was hospitalized on May 2, 2003 after an intentional overdose. (A.R.104, 145.) Plaintiff explained to hospital staff that she had just argued with her husband and had overdosed impulsively in an attempt to gain his attention. (A.R.104, 145.) A mental status examination indicated that Plaintiff did not exhibit "suicidal or homicidal ideations or hallucinations," that Plaintiff "appeared alert and orientated," that her "[m]emory was intact" and that her "[i]nsight and judgment were good." (A.R.145.) When Plaintiff was discharged on May 8, 2003, she was diagnosed with major depression, but her "[m]ental status examination was essentially within normal limits, with normal cognition, affect, thought content and thought processes." (A.R.104, 146.)

Hartford forwarded Plaintiff's medical records to Brian Mercer. M.D. ("Dr.Mercer"), a physician with the University Disability Consortium ("UDC"), an independent group of physicians specializing in disability evaluation, for third-party review. (A.R.87.) Dr. Mercer reviewed all of Plaintiff's treatment records and concluded that Plaintiff was capable of working in a sedentary occupation. (A.R.94.) As to Plaintiff's back problems. Dr. Mercer concluded that Plaintiff suffered from mild to moderate cervical spondylosis with chronic cervical spine degeneration. (A.R.91.) Dr. Mercer also noted that Plaintiff suffered from a herniated disc, but that the herniation caused only "minimal lumbar pain" as of August 2003 and would therefore not affect her functionality. *Id.* Dr. Mercer believed that Plaintiff suffered from chronic pain syndrome, but that Plaintiff's "reported symptoms [of pain] exceed the objective findings." *Id.* Dr. Mercer rejected the possibility that Plaintiff suffered from MS, explaining that "[t]he medical records do not provide objective information to substantiate a diagnosis of multiple sclerosis" and that the MRI findings were "age-related and nonspecific." *Id.* Nor did the MRIs indicate that Plaintiff suffered from demyelinating disease. (A.R.88.) As to Plaintiff's vision problems. Dr. Mercer recommended that,

in the event that Plaintiff actually had antiphospholipid antibody syndrome, Plaintiff should be "allow[ed] to rest for one to five minutes as necessary." (A.R.93–94.) Plaintiff required "no specific limitations on frequent keyboarding or other visual limitations at performing fine detail work," however. (A.R.94.)

Dr. Mercer consulted with Drs. Kadingo and Elliott over the telephone to determine Plaintiff's level of functionality. Dr. Kadingo advised Dr. Mercer that Plaintiff's eyes were normal and that she had no need for visual restrictions. (A.R.97.) Dr. Elliott advised Dr. Mercer that the likelihood that Plaintiff had MS was "relatively low" and agreed with Dr. Mercer that Plaintiff's reported pain exceeded the objective evidence. (A.R.99.) Dr. Mercer reported that when he asked Dr. Elliott about Plaintiff's work capability, Dr. Elliott responded that, from a physical perspective. Plaintiff could work in a sedentary occupation. (A.R.100.) Dr. Mercer sent Dr. Elliott a two page letter summarizing their discussion, which asked Dr. Elliott to "provide [his] signature in the space below to acknowledge [his] agreement with the contents of this letter amended to include whatever changes [he had] made." (A.R.100.) Dr. Elliott signed the letter and returned it to Dr. Mercer with no changes, thereby rendering his opinion that Plaintiff was capable of performing sedentary work. (A.R.99–100.) Dr. Mercer reached his final conclusion that

> from the disability date of 7/12/02 through the elimination period of 1/8/03 and onward, there is no objective information in the medical records that would preclude functioning at a full-time sedentary basis with the restrictions as outlined above which include an ability to change position on an hourly basis, not working at unprotected heights [or] on ladders, and have an opportunity to rest for one to five minutes during the epi-

sodes of monocular visual obscuration. There are no specific limitations on frequent keyboarding or other visual limitations at performing fine detail work.

(A.R.94.) Hartford upheld the denial of Plaintiff's claim for long term disability benefits on October 23, 2003. (A.R.78.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). The movant may meet this standard by presenting evidence demonstrating the absence of a dispute of material fact or by showing that the nonmoving party has not presented evidence in support of an element of its case on which it bears the burden of proof. Id. at 322–23, 106 S.Ct. 2548. The moving party need not supply "affidavits or other similar materials negating the opponent's claim." Id. at 323, 106 S.Ct. 2548.

Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324, 106 S.Ct.

2548 (quoting Fed.R.Civ.P. 56(e)). Although the nonmoving party need not present evidence that would be admissible at trial, it may not rest on his pleadings. *Id.* "[T]he plain language of rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548; *see also Graham v. State Farm Mut. Ins. Co.,* 193 F.3d 1274, 1281–82 (11th Cir.1999).

■ Under ERISA, the Plaintiff has "the burden of showing that [s]he is entitled to the 'benefits under the terms of [the] plan.'" *Stvartak v. Eastman Kodak Co.,* 945 F.Supp. 1532, 1536 (M.D.Fla.1996) *aff'd,* 144 F.3d 54 (11th Cir.1998) (quoting 29 U.S.C. § 1132(a)). *See also Horton v. Reliance Standard Life Ins. Co.,* 141 F.3d 1038, 1040 (11th Cir.1998) (holding that ERISA plaintiff "bears the burden of proving [her] entitlement to contractual benefits"). This burden is the same whether or not the administrator denies a claim initially or decides to discontinue benefits after initially approving them. *See Hufford v. Harris Corp.,* 322 F.Supp.2d 1345, 1360 (M.D.Fla.2004) (noting that claimant "retains the burden of proving continued disability" after benefits are discontinued and that administrator need not "show[ ] a change in claimant's condition").

"ERISA provides no standard for reviewing decisions of plan administrators or fiduciaries." *Williams v. BellSouth Telecommunications, Inc.,* 373 F.3d 1132, 1134 (11th Cir.2004.) Courts apply one of three standards of review, depending on the terms of the plan and whether a conflict of interest exists with regard to the identities of the insurer and administrator:

(1) *de novo* where the plan does not grant the administrator discretion [*i.e.,* does not exercise discretion in deciding claims;] (2) arbitrary and capricious. [where] the plan grants the administrator [such] discretion; and (3) heightened arbitrary and capricious where [the plan grants the administrator such discretion but] ... [he has] ... a conflict of interest.

*Id.* (quoting *HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co.,* 240 F.3d 982, 993 (11th Cir.2001)).

■ The Policy gave Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms" of the Policy. (Ex. A. p. 14.) Since Hartford both funded and administered the Policy, the Court will review its decision under a heightened arbitrary and capricious review standard. (Defs' Stmt of Facts, ¶ 1, 3.) "[T]he distinctions between the heightened arbitrary and capricious, arbitrary and capricious, and *de novo* standards of review have become difficult to discern over time." *Williams,* 373 F.3d at 1137. *De novo* review affords no deference to the administrator's decision. *Id.* The arbitrary and capricious standard is akin to the "abuse of discretion" standard. *Id.* (citing *Shaw v. Connecticut Gen. Life Ins. Co.,* 353 F.3d 1276, 1284–85 n. 6 (11th Cir.2003)). The heightened arbitrary and capricious standard falls "somewhere between" the two. *Id.* The Eleventh Circuit set forth the analytical framework of the heightened arbitrary and capricious standard of review in *Williams:*

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is 'wrong' (*i.e.,* the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision is in fact '*de novo* wrong,' then determine whether he was vested with discretion in

reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is 'de novo wrong' and he was vested with discretion in reviewing claims, then determine whether 'reasonable' grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

373 F.3d at 1138. In other words, if the Court, applying the de novo standard, concludes that the denial was not "wrong," the inquiry ends. See id. (concluding that decision to deny benefits was not "wrong" under de novo standard, thereby obviating need to perform heightened arbitrary and capricious review); HCA, 240 F.3d at 993 ("Regardless of whether arbitrary and capricious or heightened arbitrary and capricious review applies, the court evaluates the claim administrator's interpretation of the plan to determine whether it is 'wrong.' "). See also id. citing (Godfrey v. BellSouth Telecommunications, Inc., 89 F.3d 755, 758 (11th Cir.1996) ("we first conduct a de novo review to decide if the [claims administrator's] determination was wrong."); Brown v. Blue Cross & Blue Shield of Ala., Inc., 898 F.2d 1556, 1566 n. 12 (11th Cir.1990) ("[i]t is fundamental that the fiduciary's interpretation first must be 'wrong' from the perspective of de novo review before a reviewing court is concerned with the self-interest of the fiduciary."); Marecek v. BellSouth Telecommunications, Inc., 49 F.3d 702, 705–06 (11th

Cir.1995) (court will only search the record for existence of conflict in the event that it disagrees with decision to deny benefits).

█ Pursuant to either the arbitrary and capricious or heightened arbitrary and capricious standard of review, the Court confines it review to the administrative record as it existed at the time the administrator denied the claim for benefits. See Parness v. Met. Life. Ins. Co., 291 F.Supp.2d 1347, 1356 (S.D.Fla.2003) ("Because the Court has concluded that the heightened arbitrary and capricious standard of review is appropriate in this matter, the Court shall limit its review to that evidence which was before Metlife at the time it denied Parness's claim for benefits."); Lee v. Blue Cross/Blue Shield of Ala., 10 F.3d 1547, 1550 (11th Cir.1994) ("Application of the arbitrary and capricious standard requires us to look only to the facts known to the administrator at the time the decision was made to deny Lee coverage.") (citation omitted).

### III. DISCUSSION

The first step in the Court's inquiry is to determine whether Hartford was "wrong" in denying Plaintiff long term disability benefits. See Williams, 373 F.3d at 1138; HCA, 240 F.3d at 993. For Plaintiff to prevail, she must demonstrate that the administrative record as it existed at the time of Hartford's decision to deny benefits contains evidence that demonstrates her inability to perform the essential duties of her occupation as title examiner.

█ None of the physicians who treated Plaintiff or reviewed her file concluded that Plaintiff was unable to perform the functions of her position. Dr. Elliott, Plaintiff's self-described "personal physician" opined that, from a physical perspective, Plaintiff was capable of performing sedentary work. He felt it unlikely that Plaintiff suffered from MS and believed

that Plaintiff's chronic pain syndrome symptoms were exaggerated. The Court cannot say that it was "wrong" for Hartford to rely on the medical opinion of Plaintiff's personal physician as a basis for denying her claim. *See Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1452 (11th Cir.1997) (affirming summary judgment for administrator where one of claimant's two treating physicians advised that claimant was "capable of sedentary work"); *Heller v. Fortis Benefits Ins. Co.*, 142 F.3d 487, 491 (D.C.Cir.1998) (affirming summary judgment for administrator when "attending physician" advised that claimant was "OK for sedentary work"); *Lane v. Dir. of Employee Benefits*, 253 F.Supp.2d 57, 63 (D.Mass.2003) (granting summary judgment for administrator where claimant's "primary treating physician" believed claimant was "able to perform sedentary work").

Dr. Elliott was not the only physician who believed Plaintiff was capable of performing her job duties. however. All of the physicians consulted in this matter, both treating and reviewing, agreed that Plaintiff's medical problems did not prevent her from performing the functions of her position as a title examiner. Psychotherapist Dr. Broadwell did not believe that Plaintiff's depression would keep her from working. Dr. Broadwell's assessment of Plaintiff was consistent with that of Savanna's Hospital, which concluded that Plaintiff's mental state was "within normal limits, with normal cognition, affect, thought content, and thought process." (A.R.104.146.) Dr. Steingo did not diagnose Plaintiff with MS, and Dr. Kadingo advised that Plaintiff did not suffer from any visual impairments. Dr. Mercer reviewed all of the medical evidence adduced in this case and concluded that Plaintiff was capable of performing sedentary work, including frequent keyboarding and other fine detail work, on a full-time basis so long as she could shift positions hourly and rest her eyes if necessary. The Court cannot say that it was "wrong" of Hartford to rely on the findings of an independent reviewing physician such as Dr. Mercer. *See Gannon v. Met. Life Ins. Co.*, 360 F.3d 211, 214 (1st Cir.2004) ("physician's review of a claimant's file" is "reliable medical evidence" to support denial of benefits); *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir.1998) (administrator "entitled to rely" on physician's "review of [claimant's] medical file"); *Kocsis v. Standard Ins. Co.*, 142 F.Supp.2d 241, 252 (D.Conn.2001) (summary judgment appropriate based on "review[ ][of] the plaintiff's entire claim file"). All of the medical experts consulted agreed that Plaintiffs conditions would not keep her from working in a sedentary-level position. The Court cannot say that it was "wrong" for Hartford to rely on the opinions of multiple treating physicians, including Plaintiff's "personal physician." and the opinion of an independent reviewing physician as the basis for its denial.

■ Plaintiff argues that Hartford erred by not evaluating her ability to perform what she claims were the particular tasks of her job. Plaintiff claims that her position with Fidelity required her to drive 25 miles to the Fort Pierce courthouse to examine titles; lift and carry items weighing 20 to 30 pounds; bend, reach and kneel to review tract books and maps; read microfilm; operate a microfilm machine and remain alert and attentive at all times. Plaintiff's argument overlooks Policy language defining "Your Occupation" as "your occupation as it is recognized in the general workplace" and "does not mean the specific job you are performing for a specific employer," however. (Ex. A, p. 17.) Although Plaintiff may have been unable to perform some particular on-the-job assignment, the medical opinions presented to Hartford were in accord that Plaintiff's

health conditions would not keep her from performing sedentary tasks, including close reading and detail work. "A person may not be able to perform a specific job assignment, but still be able to perform the duties generally understood to be part of his or her 'occupation.'" *Ehrensaft v. Dimension Works Inc. LTD Plan,* 120 F.Supp.2d 1253, 1259 (D.Nev.2000). When an ERISA document is unambiguous, the "plan language controls." *Meadows v. Cagle's Inc.,* 954 F.2d 686, 691 (11th Cir. 1992). The plain language of the Policy directed Hartford to evaluate Plaintiff's ability to perform her occupation as it is generally recognized in the workforce. The Court cannot say that Hartford erred in applying the "general workplace" standard in evaluating Plaintiff's capacity to perform her occupation.

Even if the Policy left the term "Your Occupation" undefined, Plaintiff would still be unsuccessful in arguing that Hartford should have evaluated her capabilities to perform her particular tasks. When the term "occupation" is undefined, courts properly defer to the Department of Labor's Dictionary of Occupational Title's ("DOT") definition of the term because insurers issuing disability policies "cannot be expected to anticipate every assignment an employer might place upon an employee outside the usual requirements of his or her occupation." *Ehrensaft,* 120 F.Supp.2d at 1259 (D.Nev.2000). *See also Dionida v. Reliance Standard Life Ins. Co.,* 50 F.Supp.2d 934, 939 n. 4 (N.D.Cal. 1999) (noting that the DOT is "widely and routinely used to define occupations in the U.S. economy" and that it is "reasonable for [claim] administrators, and courts, to use it" in making disability determinations under ERISA); *Gallagher v. Reliance Standard Life Ins. Co.,* 305 F.3d 264, 270–73 (4th Cir.2002) (upholding reliance on DOT as "objectively reasonable" in ERISA action and noting that "[a] general job description of the DOT, to be applicable, must involve comparable duties but not necessarily every duty"). The DOT describes a title examiner as one who

[s]earches public records and examines titles to determine legal condition of property title: Examines copies of records, such as mortgages, liens, judgments, easements, vital statistics, and plat map books to determine ownership and legal restrictions and to verify legal description of property. Copies or summarizes (abstracts) recorded documents, such as mortgages, trust deeds, and contracts affecting condition of title to property. Analyzes restrictions and prepares report outlining restrictions and actions required to clear title. When working in title-insurance company, prepares and issues policy that guarantees legality of title.

*Available at http://www. oalj.dol.gov/public/dot/refrnc/dot01c.htm.* The DOT description therefore supports Hartford's conclusion that Plaintiff was employed in a sedentary occupation.

Plaintiff also claims that Hartford ought not to have relied on Dr. Mercer's assessment that Plaintiff could perform her job so long as she was allowed to change positions on an hourly basis because "no employer can make such an accommodation." (Pl.'s Resp. at 17.) To the contrary, courts have repeatedly upheld administrative claim denials where medical evidence indicates that shifting position as needed would enable the claimant to perform sedentary work. *See Turner v. Delta Family–Care Disab. & Surv. Plan,* 291 F.3d 1270, 1273–74 (11th Cir.2002) (affirming summary judgment for administrator who determined plaintiff could perform clerical work by "changing positions as needed"); *Gannon,* 360 F.3d at 213 (upholding determination that claimant was "capable of performing sedentary work" because she could "change positions every five min-

utes" to remedy discomfort from sitting for extensive periods of time); *Schatz v. Mut. of Omaha Ins. Co.,* 220 F.3d 944, 949 (8th Cir.2000) (affirming summary judgment for administrator when claimant could perform "sedentary" job as medical review nurse so long as she could "change positions as needed").

Plaintiff attached to her summary judgment motion sworn declarations from herself and Dr. Elliott dated September 23, 2004 and October 12, 2004, respectively. Plaintiff's declaration recounts her medical problems and claims that they kept her from performing the unique functions of her position. Dr. Elliott's declaration states that the only occupational task Plaintiff is capable of performing is answering telephones. The Court will not consider these declarations as they were not before Hartford at the time it denied Plaintiff's claim. Plaintiff cites *Lake v. Hartford Life & Acc. Ins. Co.,* 218 F.R.D. 260, 261 (M.D.Fla.2003) for the proposition that a claimant may submit evidence not before the administrator at the time of the denial of benefits in an effort to prove that the denial was an abuse of discretion. *Lake* holds, rather, that a plaintiff may conduct discovery to determine what facts were available to the administrator at the time it made the decision, but does not allow supplementation of the record after the fact. *Id. See also Barnhart v. UNUM Life Ins. Co.,* 179 F.3d 583, 590 (8th Cir. 1999) (affirming summary judgment for administrator and upholding refusal to consider plaintiff's affidavit that was "not before the administrator at the time of the benefits determination"); *Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d 609, 614–15 (6th Cir.1998) (affirming summary judgment for administrator and upholding refusal to consider physician affidavit "not included in the record upon which [the administrator] based its decision"); *Lopes,* 332 F.3d at 5 (1st Cir.2003) (affirming summary judgment for administrator and upholding refusal to consider physician affidavit not presented to the plan administrator).

■ Finally, Plaintiff maintains that her receipt of Social Security disability benefits is evidence that Hartford's denial of her request for long term benefits was arbitrary and capricious. The Social Security Administration awarded Plaintiff benefits in August of 2004, ten months after Hartford denied Plaintiff's appeal and well after Plaintiff filed this action. Whereas the Social Security award was not before Hartford at the time it made its decision to deny benefits, the Court declines to consider it.

Even if the Social Security award were properly before the Court for consideration, the Court "owes no deference to findings made under the Social Security Act." *Ciulla v. Usable Life,* 864 F.Supp. 883, 888 (W.D.Ark.1994). Plaintiff's receipt of Social Security benefits has nothing to do with whether she is entitled to receive benefits pursuant to the Policy:

In determining entitlements to Social Security benefits, the adjudicator measures the claimant's condition against a uniform set of federal criteria. "[T]he validity of a claim to benefits under an ERISA plan," on the other hand, "is likely to turn," in large part, "on the interpretation of terms in the plan at issue." ... Deference is due that view.

*Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 833, 123 S.Ct. 1965, 1971, 155 L.Ed.2d 1034 (2003) (quoting *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 948, 103 L.Ed.2d 80 (1989)). The Social Security Administration applies a "treating physician rule." whereby the Administration "will generally 'give more weight to opinions from treating sources.'" *Id.* at 829, 123 S.Ct. at 1969. This rule does not govern ERISA disability claims. *Id. See Ciulla,* 864

F.Supp. at 888 (granting summary judgment for defendant despite Plaintiff's receipt of Social Security award); *Paramore*, 129 F.3d at 1452 n. 5 (affirming summary judgment award and rejecting as "unpersuasive" argument that court should have accorded greater weight to receipt of Social Security benefits); *Coker v. Met. Life Ins. Co.*, 281 F.3d 793, 798 (8th Cir.2002) (summary judgment for administrator notwithstanding Social Security award). The Social Security award to Plaintiff illustrates why Social Security determinations are not persuasive in ERISA benefits cases.

## IV. CONCLUSION

THE COURT, having considered the parties written pleadings, oral arguments and the pertinent portions of the record, hereby

ORDERS AND ADJUDGES that Defendants' Motion for Summary Judgment, filed September 16, 2004 [DE 33] is GRANTED, and Plaintiff's Motion for Summary Judgment, filed September 28, 2004 [DE 38] is DENIED. Final judgment shall be entered by separate order.