**Rose MANNING, Plaintiff,**

v.

**JOHNSON & JOHNSON PENSION COMMITTEE, Defendant.**

No. 3:05–cv–848–J–32TEM.

United States District Court,
M.D. Florida,
Jacksonville Division.

May 16, 2007.

Jay Charles Floyd, Law Office of Jay C. Floyd, St. Augustine, FL, for Plaintiff.

Richard N. Margulies, Akerman Senterfitt, Jacksonville, FL, for Defendant.

## ORDER

TIMOTHY J. CORRIGAN, District Judge.

This ERISA case is before the Court on Defendant Johnson & Johnson Pension Committee's Motion for Final Judgment Based on Review of the Administrative Record. (Doc. 22). Plaintiff, Rose Manning ("Manning"), filed a response in opposition. (Doc. 30). In the opposition, Manning petitions for judgment to be entered in her favor. On December 8, 2006, the Court held oral argument. (Doc. 38). On March 7, 2007, the Court entered an Order requesting supplemental briefing from the parties concerning: (1) the legal requirements under ERISA for appeal type review at the administrative level; and (2) what effect the alleged procedural irregularity in this case should have on the Court's ruling. (Doc. 39). On April 4, 2007, the Pension Committee filed its supplemental brief on these issues. (Doc. 42). On April 17, 2007, Manning filed a response brief (Doc. 43).

## I. BACKGROUND

### A. The Parties and the Plan

Plaintiff is a fifty-six year old female, who was formerly employed with Johnson & Johnson Vision Products, Inc. ("J & J") as a processing technician (a light duty

job). Manning ceased work on February 17, 1995. She received short term disability ("STD") benefits during her Elimination Period and long-term disability ("LTD") benefits during the full two years of her "Own Occupation" period. After the initial two years of disability benefits during the "Own Occupation" period, Manning transitioned into the "Any Occupation" period. Manning received LTD benefits for her maladies, chronic fatigue syndrome and fibromyalgia, for over nine years until the administrator discontinued her benefits effective July 24, 2004.

Johnson & Johnson's Long Term Disability Plan grants discretion to the Johnson & Johnson Pension Committee ("Pension Committee") to administer the plan and determine entitlement to benefits. (Doc. 23–2, R. 0541, 0559–0560). The Committee, in turn, is empowered to delegate its administrative function to a "Claims Service Organization" (CSO). (*Id.* at R. 0559–0560). The Committee delegated that authority to Broadspire, which administered Manning's claim for continued LTD benefits. However, once Broadspire made the initial decision to discontinue benefits and denied Manning's first appeal, the Pension Committee considered Manning's final appeal. The "Committee" is comprised of only one individual, Richard McDonald Director of Corporate Benefits for Johnson & Johnson. (Doc. 36–6, McDonald Dep. at pp. 7, 13). Mr. McDonald holds a Bachelor's Degree in liberal arts. (*Id.* at p. 9). He has no medical training. (*Id.* at p. 13).

The Plan is funded by contributions from the Johnson & Johnson Voluntary Employee Benefit Trust. (Doc. 23–2, R. 0562–0563). Thus, while Broadspire administered the claim for continued benefits and the Pension Committee made the final appeal decision, benefits were paid out of the Trust.

For periods of disability beginning prior to January 1, 2001, "Total Disability" means:

(a) during the portion of any period of disability not exceeding 24 months, plus the duration of the Elimination Period, the complete inability of the Participant, due to Sickness or Injury, to perform the material and substantial duties of the Participant's regular job, with or without reasonable accommodation, AND

(b) during the remainder, if any, of the period of disability, the complete inability of the Participant, due to Sickness or Injury, to do any job for which the Participant is (or may reasonably become), with or without reasonable accommodation, qualified by training, education or experience.

(*Id.* at R. 0542). The critical period in this case is subsection (b), the "Any Occupation" period. For approximately seven of the nine years, Johnson & Johnson paid LTD benefits to Manning under the "Any Occupation" definition of "Total Disability."

Article IV, "Benefits Eligibility", contains a subsection titled "Evaluation of Participant's Medical Status", which provides in part:

The Plan Administrator and its authorized representatives, including without limitation the Claims Service Organization, shall have the right to conduct evaluations of a Participant's medical status and eligibility for benefits under the plan at any time while an application for benefits is pending, a Participant is receiving benefits or a claim or claim appeal is pending. It is the Participant's responsibility to provide the Claims Service Organization with all information necessary to evaluate his or her medical condition and functional capacity, includ-

ing but not limited to information supplied by the treating Provider. (*Id.* at R. 0550).

## B. Background Facts

### 1. *Medical History from August 1995 through May 2004*

From 1995 through 2004, Dr. Kyle Carter (Family Practitioner) served as Manning's treating physician. On August 28, 1995, Dr. Carter prepared a Physician's Certification of Total Disability and opined that due to chronic fatigue syndrome, Manning was totally disabled. (Doc. S–1, R. 0053).[1] On August 29, 1996, Dr. Carter opined that Manning's chronic fatigue syndrome was still a disabling condition and that he did not expect changes in the near future. (*Id.* at R. 0066–67). On an undated Attending Physician Statement (that denotes the most recent treatment date as 1/20/2000), Dr. Carter notes that Manning continued to suffer from "marked fatigue", her status was "unchanged" and her prognosis was "poor"; further, Dr. Carter rated Manning's physical impairment as "Class 4: Marked limitation of functional capacity/capable of sedentary work." (*Id.* at R. 0064–65). Then, on June 4, 2001, Dr. Carter noted Manning's status as "unchanged," the prognosis as "unknown," and he increased her physical impairment to the most severe level: "Class 5: Severe limitation of functional capacity/incapable of sedentary work." (*Id.* at R. 0062–63).

On August 13, 2002, Manning filled out an LTD Questionnaire. (*Id.* at R. 131–133). On the questionnaire, Manning noted: "My problem is the fatigue—When it hits, I cannot do anything but sit. It is an effort to lift my arms—even to breathe." Manning notes that she can sweep/vacuum, cook, watch TV, dress without assistance, make beds, dust/mop, garden, climb stairs (hard bad knee), read (little—concentration problem), walk (little), drive and do laundry. However, Manning notes that "all of these are done in short spurts and *can not* do when fatigue hits me." (*Id.*). Manning also notes in her August 13, 2002 LTD Questionnaire that her daily activities include: "Computer for awhile—talk to friends on internet, some cleaning (when can), cook supper. Sometimes go to yard sales with my daughter. Watch TV." Manning also notes that she is "[g]oing to take some classes in fall term—They will be Online and Telecourse. Not sure of frequency." (*Id.*).

Also on August 13, 2002, Dr. Greg McHugh (Family Practitioner) prepared a Physician's Report of Physical Activity. Dr. McHugh noted that Manning could sit, stand and walk only one to two hours per work shift, that she was otherwise entirely limited in her physical faculties and that she would "never" be able to be released to full-time work activity. (*Id.* at R. 0096–97).

On August 12, 2003, Dr. Wendy Weinstein (Internal Medicine) performed a peer review for Broadspire (formerly Kemper). (*Id.* at R. 0219–21). Dr. Weinstein reviewed physician notes and Manning's LTD Questionnaire. Because Dr. Weinstein opined that Manning's medical notes did not comport with Dr. McHugh's opinion that she could "never" be released to sedentary duty, Dr. Weinstein telephoned Dr. McHugh. According to Dr. Weinstein, Dr. McHugh stated that Manning's complaints were mostly subjective and related to pain. Dr. McHugh also stated that Manning's pain seemed to be significant and that she could potentially improve in the future once her "social" situation improved. (*Id.* at R. 0221). Dr. McHugh

---

1. Manning's medical records that comprise the Administrative Record were filed under seal. Citations to the portions of the Adminis- trative Record filed under seal are denoted as "S–1, R. ——".

noted that a functional capacity examination would be appropriate to document Manning's restrictions and limitations. (*Id.*). Based on the medical records, interview of Dr. McHugh and the LTD Questionnaire, Dr. Weinstein concluded that "there is insufficient documentation of a functional impairment that would preclude the claimant from performing the job duties of any occupation." Dr. Weinstein opined that Manning should be in a sedentary job. (*Id.*).

On September 19, 2003, Manning underwent a Functional Capacity Examination (FCE) administered by Heartland Therapy Provider Network. (*Id.* at R. 222–237). The evaluator found that Manning gave reliable effort and was "able to perform the following activities on a Constant basis: Fingering (L) and Fingering (R); on a Frequent basis: Stoop, Reach Immediate (L), Reach Immediate (R), Handling (L), Handling (R), and Sitting; [and] on an Occasional basis: Walk and Standing." (*Id.* at R. 0222). Ultimately, the evaluator found that Manning could return to work in an occupation in the "Light Physical Demand Classification" range with the noted functional abilities, but that she "may benefit from a gradual return to work, beginning at 4 hours and progressing up to 8 due to her sitting and standing tolerances." (*Id.*).

On October 22, 2003, Broadspire (via Reehana Sherriff) had a telephone conversation with Dr. McHugh concerning Manning and her FCE. (*Id.* at R. 159). After the telephone conversation, Dr. McHugh wrote a letter to Ms. Sherriff criticizing the FCE as inadequate to fully evaluate Manning's functional capacity because it was "too short" and failed to consider that Manning's problem is "repetitive movement with continuous activity" (as opposed

to performing isolated activities in spurts). Dr. McHugh stated that, with repetitive movement, Manning develops intrascapular discomfort and typical fibromyalgia pain scattered through the neck, chest, rhomboid, trapezius, thigh and low back regions, which exacerbates her chronic fatigue syndrome. Dr. McHugh concluded that Manning needed a more extensive FCE. (*Id.*).

On April 20, 2004, Dr. McHugh prepared an Evaluation of Manning's Physical Abilities. Dr. McHugh checked "sedentary" for all "Activities Rated by Strength Level." "Sedentary" was the least restrictive category; there was no category for "No Activity," or the like. (*Id.* at R. 160). In "section 2," which measured "Activities Rated by Frequency and Duration," Dr. McHugh checked "Never" for all functional activities. (*Id.*). The functional activities addressed in this section include reaching to front (right and left), reaching overhead (right and left), walking, standing, sitting, stooping, kneeling, climbing stairs and handling (right and left). (*Id.*). On line 28 of that same form, however, Dr. McHugh rated Manning's "Sustainable (8–hour) energy expenditure" as "Sedentary" (which was again the least restrictive category—there was no category for "None" or "No Activity"). (*Id.*). Dr. McHugh did not release Manning back to her "own occupation" (which was a light duty job). (*Id.*).[2]

That same day, Dr. McHugh prepared another physician statement at Broadspire's request (a Broadspire form). Dr. McHugh noted that Manning's prognosis relating to her chronic fatigue syndrome was "poor," that she has reached Maximum Medical Improvement ("MMI") and that her physical limitations are "Class 4— Marked limitation of functional capaci-

---

**2.** At oral argument, counsel for the Pension Committee informed the Court (without dispute from Manning) that this form (R. 160) is not a Broadspire form. Instead, it is a form apparently created and submitted by Dr. McHugh.

ty/capable of sedentary work." (*Id.* at 161; Doc. 36–3).[3] The most restrictive physical impairment on the April 20, 2004 physician statement is "Class 5–Severe limitation of functional capacity/incapable of sedentary work." (Doc. S–1, R. 0161).

On May 10, 2004, Dr. Weinstein performed a second peer records review. (Doc. S–1, R. 244–45). Dr. Weinstein reviewed the September 19, 2003 FCE and her prior peer review; there is no record that Dr. Weinstein reviewed Dr. McHugh's two physician statements dated April 20, 2004. (*Id.*). Dr. Weinstein found that while the FCE opined that Manning is capable of light duty work, she believes Manning is capable of only sedentary work. Weinstein again noted her prior conversation with Dr. McHugh, during which Dr. McHugh stated that Manning was limited to sedentary work. Weinstein's report concludes that a second "peer-to-peer" interview with Dr. McHugh was unnecessary. (*Id.*).

### 2. *May 2004 Denial of Continued Benefits and Appeal*

On May 24, 2004, Broadspire wrote Manning and informed her that her disability benefits would cease on July 24, 2004. (*Id.* at R, 0246–48). In the letter, Broadspire informed Manning that it had attempted to obtain documentation from Dr. McHugh concerning whether any disability persisted after July 23, 2004 and that the information it had received from Dr. McHugh did not show Manning's functional disabilities. Broadspire discussed the findings of the September 19, 2003 FCE and Dr. Weinstein's peer reviews and found that as of July 23, 2004, Manning was capable of sedentary work for eight hours per day. (*Id.*).

On June 30, 2004, Manning saw Dr. Bhupinder Bolla (Pain Management). (*Id.* at R. 297–301). Dr. Bolla consulted with Manning and authored a detailed report including medical history and a treatment plan. Dr. Bolla suggested a comprehensive pain management plan, isolated physical therapy of soft tissue areas and to continue certain medications. Dr. Bolla also ordered an MRI of the low back. (*Id.*). On July 2, 2004, Manning had the MRI; it showed Manning's spine was largely normal, but that there was some degeneration in the L4–5 vertebrae. (*Id.* at R. 304–05).

On July 6, 2004, Manning, without aid of counsel, wrote a letter to Broadspire appealing the adverse determination and explaining that Broadspire did not understand the amount of pain she experienced on a daily basis. (*Id.* at R. 249–50). With the letter, Manning enclosed a log of her daily activities spanning May 28, 2004 through July 6, 2004. (*Id.* at R. 252–270). In sum, the log reports that Manning sleeps frequently and experiences pain daily. On the days Manning engages in activities (e.g., cooking, doctor visits), it is routinely followed by days where she is entirely sedentary or sleeping. (*Id.*).[4]

On October 4, 2004, Dr. Dennis Mazal (Pulmonary and Internal Medicine) performed a peer records review for Broadspire. (*Id.* at R. 238–40). After reviewing Manning's medical history (including Dr. McHugh's April 20, 2004 physician statements), Dr. Mazal concluded that Manning's chronic fatigue and fibromyalgia did not preclude her from performing any occupation. Dr. Mazal also noted that "[h]er Functional Capacity Examination clearly

---

3. The first page to the report beginning in the record at R. 161 was not originally contained in the administrative record. Manning's counsel filed the first page of this report. It is found in the docket at Doc. 36–3.

4. Manning submitted additional log entries spanning July 14, 2004 through August 2, 2004. (R. 285–96).

indicated that the claimant was capable of performing up to light physical demand work." (*Id.* at R. 0240).

On September 23, 2004, Dr. Eddie Sassoon (Pain Management/Physiatry) performed a peer review for Broadspire. (*Id.* at R. 241–43). Dr. Sassoon reviewed the medical records and MRI and answered the following question in the negative: "Based on the documentation, job description and peer to peer (when applicable), does the information support a functional impairment from 7/25/04 to present?". Dr. Sassoon relied on the MRI findings, examinations by Dr. Bolla concerning Manning's range of motion and gait deficits and the September 19, 2003 FCE. (*Id.* at R. 0243).[5] On November 5, 2004, Broadspire informed Manning that her appeal was denied and that she had the right to an additional appeal to the Pension Committee. (*Id.* at R. 374–377).

### 3. *Appeal to Pension Committee*

On December 13, 2004, Manning's counsel (Attorney Jay Floyd) informed the Pension Committee that he had recently commenced representation of Manning. (*Id.* at R. 0378). On March 8, 2005, Dr. Russell Superfine (internal medicine) performed a peer records review. (*Id.* at R. 390–394). Dr. Superfine recapitulated Manning's medical history relating to chronic fatigue, fibromyalgia and asthma and concluded that "[i]n summary, from a medical perspective, although the claimant has the above aforementioned diagnoses, there are insufficient physical and diagnostic findings to support a level of functional impairment which would preclude the

claimant from performing the duties of any occupation from 7/25/04."

On March 17, 2005, Manning's counsel submitted a letter to the Pension Committee (R. 399–401) and stated that Broadspire's continued reliance on the September 19, 2003 FCE and disregard of Dr. McHugh's April 20, 2004 "Evaluation of Physical Abilities" was "particularly troubling". Manning's counsel explained that "the FCE was a short-lived sample of my client's physical abilities which does not translate to full-time ability on a regular sustained basis as would be necessary to 'do any job' for which she is qualified." Manning's counsel also pointed out, inter alia, that the FCE is inherently flawed as it says that "below the waist work should be avoided at this time," but that Manning can "stoop" on a "Frequent basis."

On May 6, 2005, the Pension Committee (via its sole member Richard McDonald) issued a final denial of Manning's claim. (*Id.* at R. 0003–8). The Pension Committee recapitulated all of Manning's medical records and concluded that based on the FCE, the findings of Broadspire's peer review physicians, Dr. Weinstein's interview with Dr. McHugh and Dr. McHugh's physician reports opining that Manning could perform a sedentary job for a sustainable eight hour period, Manning could perform a sedentary occupation. (*Id.* at R. 0008).

## II. DISCUSSION

### A. Summary Judgment Standard

 "In an ERISA benefit denial case ... in a very real sense, the district

---

**5.** On September 23, 2004, Broadspire also enlisted Drs. Steven Schneider (Gynecology) (Doc. S–1, R. 367–69) and Elana Mendelssohn (Clinical and Neuropsychology) (*Id.* at R. 370–72) to perform peer records reviews. Complaints concerning potential maladies in these areas are sparse throughout the administrative record and do not support any enti-

tlement to benefits. Drs. Schneider and Mendelssohn found no impairment in their respective disciplines that would preclude Manning from performing any occupation. Dr. Lawrence Burnstein made the same finding from a psychological perspective in March 2005. (*Id.* at R. 395–98).

court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Curran v. Kemper Nat. Servs., Inc.*, 2005 WL 894840, *7 (11th Cir.2005) (unpublished *per curiam* opinion) (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 17–18 (1st Cir.2002)); *accord Smith v. Home Depot Welfare Benefits Plan*, 2006 WL 1980284, *4 (M.D.Fla. July 12, 2006) (unpublished opinion). "Where the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Crume v. Met. Life Ins. Co.*, 417 F.Supp.2d 1258, 1272 (M.D.Fla.2006) (quoting *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir.1999)).

In essence, the Eleventh Circuit's discussion in the unpublished *Curran*[6] decision augments the traditional summary judgment rules as applied to review of ERISA benefit denial cases such as this, yet still decides the case under Fed. R.Civ.P. 56. As Judge Conway so aptly discussed in *Crume:*

> [W]here the ultimate issue to be determined is whether there is a reasonable basis for a claims administrator's benefits decision, it is difficult to ascertain how the 'normal' summary judgment rules can sensibly apply. After all, the pertinent question is not whether the claimant is truly disabled, but whether there is a reasonable basis in the record to support the administrator's decision on that point. In other words, conflicting evidence on the question of disability

cannot alone create an issue of fact precluding summary judgment, since an administrator's decision that rejects certain evidence and credits conflicting proof may nevertheless be reasonable. 417 F.Supp.2d at 1273.

## B. Applicable ERISA Standards

■■■ Under ERISA, the plaintiff "has the burden of showing that [s]he is entitled to the 'benefits under the terms of [the] plan.'" *Stvartak v. Eastman Kodak Co.*, 945 F.Supp. 1532, 1536 (M.D.Fla.1996) (quoting 29 U.S.C. § 1132(a)) aff'd, 144 F.3d 54 (11th Cir.1998); *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir.1998). ERISA provides no standard for reviewing decisions of plan administrators or plan fiduciaries. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). After *Firestone*, the Eleventh Circuit adopted three separate standards for reviewing administrators' plan decisions: "(1) *de novo* where the plan does not grant the administrator discretion [i.e., the administrator does not exercise discretion in deciding claims]; (2) arbitrary and capricious [where] the plan grants the administrator [such] discretion; and (3) heightened arbitrary and capricious where [the plan grants the administrator such discretion but] … [he has] … a conflict of interest." *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1134–35 (11th Cir.2004) (quoting *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 993 (11th Cir.2001) (citation omitted)).

■■■ In *Williams,* the Eleventh Circuit recapitulated the applicable framework for analyzing "virtually all" ERISA plan benefit denials:

> narily disfavored, they are nevertheless persuasive. *See* 11th Cir. R. 36–2 and I.O.P. 6.

---

6. While it is true that the Eleventh Circuit's unpublished opinions are not binding authority and that reliance upon them alone is ordi-

1. Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

2. If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

3. If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

4. If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

5. If there is no conflict, then end the inquiry and affirm the decision.

6. If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Id.* at 1137–38. The *Williams* six step analysis applies in every ERISA long term disability benefits denial case. *Id.* at 1137–38; *see Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1232 (11th Cir.2006) ("regardless of whether arbitrary and capricious review or the heightened form of that standard of review applies, the court reviews de novo the claims administrator's interpretation of the plan to determine whether it is 'wrong' ") (citation omitted).

Here, though the Pension Committee is vested with discretion to either make ben-efit determination decisions or to pass that discretion to a CSO (Broadspire) and the Pension Committee does not pay benefits from its own assets, avoiding any conflict of interest, Manning disputes that the arbitrary and capricious standard applies. Manning asserts that because the Pension Committee consists of only one individual, Richard McDonald, who has no medical training, a less deferential standard of review applies. Manning cites Eighth Circuit case law, namely *Woo v. Deluxe Corp.*, 144 F.3d 1157 (8th Cir.1998), in support of her argument.

In *Woo*, the Eighth Circuit enunciated its approach to determining the appropriate form of arbitrary and capricious review in an ERISA case. 144 F.3d at 1160, 1161. "To obtain a less deferential review, [a plaintiff] must present material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty [to the plaintiff]." *Id.* (citations omitted).

"Under the first part of the sliding scale analysis, a claimant seeking a less deferential standard of review must present material, probative evidence of a palpable conflict of interest or serious procedural irregularity." *Tillery v. Hoffman Enclosures, Inc.*, 280 F.3d 1192, 1197 (8th Cir. 2002) (citing Woo, 144 F.3d at 1160). "If a claimant successfully establishes either a palpable conflict of interest or serious procedural irregularity, [s]he must also show the conflict or irregularity caused a serious breach of the plan administrator's fiduciary duty." *Id.* (citation omitted).

■ The Eighth Circuit employs a permutation for determining the standard of review in ERISA cases that is slightly different than the six step *Williams* progression in the Eleventh Circuit. The two-part *Woo* test is designed to assist a court in determining precisely where on

the "sliding scale" of the arbitrary and capricious standard that a certain case falls due to the particular conflict of interest or procedural irregularity at issue; where a given situation falls determines the appropriate level of deference given to the administrator's decision. *See Woo,* 144 F.3d at 1160, 1161. However, the Eleventh Circuit takes a different approach—that there are two distinct categories of arbitrary and capricious review which are determined solely by whether the administrator has a conflict of interest (whether the administrator pays benefits from its own assets and determines benefits entitlement); any procedural irregularities (such as that raised by Manning in this case) are addressed within the confines of those two standards. *See Williams,* 373 F.3d at 1137–38. Thus, any procedural irregularity just becomes part of the determination as to whether the administrator's decision is arbitrary and capricious or fails to meet the more exacting heightened arbitrary and capricious standard, whichever is applicable.

 Because there is no conflict of interest here, the arbitrary and capricious standard of review applies. "Under the arbitrary and capricious standard of review (sometimes used interchangeably with an abuse of discretion standard), the court seeks 'to determine whether there was a reasonable basis for the [administrator's] decision, based upon the facts as known to the administrator at the time the decision was made.'" *Hunt v. Hawthorne Assoc., Inc.,* 119 F.3d 888, 912 (11th Cir. 1997) (quoting *Jett v. Blue Cross and Blue*

*Shield of Ala., Inc.,* 890 F.2d 1137, 1139 (11th Cir.1989)). "Normally, '[a] decision to deny benefits is arbitrary and capricious if no reasonable basis exists for the decision.'" *Levinson v. Reliance Standard Life Ins. Co.,* 245 F.3d 1321, 1325–26 (11th Cir.2001) (citation omitted). Under this standard, a "wrong" but reasonable determination may not be overturned, but a "wrong" and unreasonable decision is subject to reversal. *HCA Health Servs. of Ga., Inc.,* 240 F.3d at 994; *Dibiccari v. Lockheed Martin Retirement Plan,* 244 F.Supp.2d 1308, 1312–13 (M.D.Fla.2002). While the arbitrary and capricious standard is the least demanding form of judicial review of administrative action, it is not, however, "without teeth." *McDonald v. Western–Southern Life Ins. Co.,* 347 F.3d 161, 169, 172 (6th Cir.2003). Merely because this Court's review is deferential, that does not mean that federal courts "sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Evans v. UnumProvident Corp.,* 434 F.3d 866, 876 (6th Cir. 2006) (citation omitted).

## C. Continued LTD Benefits Entitlement

This is a close ERISA case. The critical evidence in the record is: (1) the September 19, 2003 FCE; (2) the four peer reviews from Drs. Weinstein (Internal Medicine), Mazal (Pulmonary and Internal Medicine), Sassoon (Pain Management/Physiatry) and Superfine (Internal Medicine); and (3) Dr. McHugh's two April 20, 2004 physician statements.[7]

---

7. Manning cites two Eight Circuit cases, *Dillard's Inc. v. Liberty Life Assur. Co. of Boston,* 456 F.3d 894, 900 (8th Cir.2006) and *McOsker v. Paul Revere Life Ins. Co.,* 279 F.3d 586, 588–89 (8th Cir.2002), for the proposition that unless there is some significant change in the status of a participant, the previous payment of benefits weighs against the propriety of an insurer's decision to discontinue benefits. Further, the critical period in such cases

is that between when the administrator awarded benefits and the decision to terminate them. *Dillard's Inc.,* 456 F.3d at 900; *McOsker,* 279 F.3d at 588–89. It appears the Eleventh Circuit has made no specific pronouncements on this issue. This Court does not impute any type of presumption to situations where benefits are initially awarded and later discontinued, but it may be a factor in

Manning is indeed correct that the September 19, 2003 FCE primarily assessed her ability to perform certain motor functions on a short or intermittent basis, rather than continuously through an eight hour day; thus, the FCE is not dispositive in determining whether she can perform eight hours of sedentary work. That Dr. Weinstein relied heavily on the FCE in her May 10, 2004 peer records review certainly detracts from her opinion that Manning is capable of sedentary work for eight hours per day. Dr. Mazal likewise relied on the dubious FCE findings to articulate his opinion that Manning could perform even a light occupation.

Dr. Sassoon reviewed Manning's MRI findings and opined that the degenerative changes in the lumbar spine were insufficient to support a functional impairment. While Dr. Sassoon addresses Manning's complaints of fibromyalgia, he does not squarely address her chronic fatigue syndrome. Dr. Superfine set forth a detailed recapitulation of Manning's medical history and opined that while she did suffer from fibromyalgia and chronic fatigue syndrome (and other maladies that are not the focus of this case), the physical and diagnostic findings did not rise to the level of a functional impairment that precluded her from working in any occupation from July 25, 2004. Though Dr. Superfine may indeed be correct, his lack of analysis makes it difficult on review to discern the true weight to ascribe to his findings.

Dr. McHugh's two April 20, 2004 physician statements are of utmost importance in this case. The Court recognizes a majority of Dr. McHugh's first statement, which is Dr. McHugh's own form (Doc. S–1, R. 160), is somewhat confusing as to his true opinions of Manning's physical capabilities. However, on line 28 at the bottom of the form, Dr. McHugh checks "Sedentary" as the "Sustainable (8–hour) energy expenditure" for Manning. Though there is no box titled "No activity" (or the like), Dr. McHugh had an opportunity to clarify his findings if he deemed necessary, and chose not to do so. Thus, an entirely reasonable interpretation is that Dr. McHugh believed Manning capable of eight hours of sedentary work per day.

Further, on page 2 of Broadspire's form, which Dr. McHugh likewise prepared on April 20, 2004, Dr. McHugh had five clear choices as to Manning's physical impairment. Dr. McHugh chose "Class 4— Marked limitation of functional capacity/capable of sedentary work" as opposed to the least restrictive category "Class 5— Severe limitation of functional capacity/incapable of sedentary work." (*Id.* at R. 161). For a second time on the same day, Dr. McHugh chose a category that suggests his opinion is that Manning can work eight hour days in a sedentary position. Dr. McHugh never changed these opinions or submitted any documentation, statements or otherwise, recanting them. Thus, while it is true that reading Dr. McHugh's statements *in toto* leave some doubt as to his precise opinions, this Court cannot say that it was unreasonable for the Pension Committee to rely on the two statements above and determine that Manning was fit to be placed into a sedentary position.[8]

---

the overall analysis. However, the undersigned agrees with *Dillard's Inc.* and *McOsker* that the critical period of analysis is that between the initial decision to award benefits and the discontinuation thereof. That is precisely what the Court focuses on in this case.

8. In light of the confusion in Dr. McHugh's records, it would have been prudent for plaintiff to have asked for clarification from Dr. McHugh before the final benefits determination was made. Unfortunately, ambiguity and confusion in medical records seems to be endemic in ERISA cases.

Further, while Drs. Mazal, Sassoon and Superfine did not specifically discuss Dr. McHugh's April 20, 2004 Evaluation of Physical Abilities, they nevertheless listed it as a document they reviewed prior to making their independent determinations. Though the record does not inform as to the weight those physicians ascribed to Dr. McHugh's April 20, 2004 findings, their findings are nevertheless consistent with Dr. McHugh's determination that Manning could perform a sedentary position. Thus, even assuming *arguendo* that Broadspire and the Pension Committee were "wrong" to discontinue Manning's LTD benefits, this Court cannot hold that decision was unreasonable or arbitrary and capricious.[9]

The remaining issue Manning raises is the procedural irregularity that the Pension Committee is comprised of only one person, who has no medical training. This and the general legal requirements attendant to ERISA appeal review at the administrative level was the focus of the parties' supplemental briefing filed pursuant to the Court's March 7, 2007 Order (Doc. 39). As an initial matter, whether permitted or not, the Court finds it baffling that Johnson & Johnson (or any ERISA Plan administrator) would allow its Pension "Committee," which makes ultimate decisions concerning participants' benefits entitlement, to be comprised of a single individual whose only medical knowledge is that obtained on the job. Indeed, because the common definition of a "committee" is a "group of people," a cynic might be tempted to suggest that defendant was trying to ascribe more gravitas to the appeals process than it deserved. And, when Mr. McDonald signed the appeal denial letter "For the Johnson & Johnson Benefit Claims Review Committee", he engaged in hyperbole at least and deception at worst. One wonders how often this one person "committee", in its appellate capacity, has reversed a decision by Broadspire to deny benefits. The Court seriously questions whether this is what Congress and the ERISA regulation writers had in mind when they created the ERISA appeals process.

Nevertheless, in their supplemental briefs, the parties agree that a single layperson can serve as the Plan Administrator. In fact, 29 C.F.R. § 2560.503–1(h)(2)(4) set forth the basic requirements for a "full and fair review" under an ERISA claims procedure (including the appeals process). The claims procedure must provide: (i) claimants at least 180 days (for disability plans) to appeal following an adverse benefit determination; (ii)

---

9. The Court notes that the Social Security Administration determined Manning to be disabled as of March 15, 1994. (Doc. S–1, R. 143–158). The award references chronic fatigue syndrome, fibromyalgia, carpal tunnel syndrome, cervical spondylosis and affective disorder; the main focus of the SSA decision is based on Manning's chronic fatigue syndrome. The award notes that the SSA's decision will be revisited every three years. There is nothing in the record suggesting that Manning no longer receives SSA disability benefits. Thus, while the undersigned may consider that Manning was awarded and still receives SSA benefits in reviewing the plan administrator's decision regarding eligibility for benefits under ERISA, *see Kirwan v. Mar-* *riott Corp.,* 10 F.3d 784, 790 n. 32 (11th Cir.1994), such a determination is not dispositive. *See Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) (there are "critical differences between the Social Security disability program and ERISA benefit plans ..."); *see also Pari–Fasano v. ITT Hartford Life and Acc. Ins. Co.,* 230 F.3d 415, 420 (1st Cir.2000) ("[B]enefit eligibility determinations by the Social Security Administration are not binding on [ERISA] disability insurers"); *Crume,* 417 F.Supp.2d at 1276 (citation omitted). Thus, while the Court factored the receipt of SSA benefits into its calculus, that Manning still receives them is not case determinative.

claimants the opportunity to submit "written comments, documents, records, and other information relating to the claim for benefits;" (iii) reasonable access to and copies of documents, records and other information relevant to the claim; and (iv) "a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim." 29 C.F.R. § 2560.503–1(h)(2)(i)–(iv). Where, as here, appeals of disability determinations at the administrative phase are at issue, ERISA regulations require additional protections, such as that the fiduciary making a decision on appeal affords no deference to the initial adverse benefits determination, and, when making the decision on appeal based on a medical judgment, the fiduciary must "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. §§ 2560.503–1(h)(3)(ii–iii) & (4).

■ Though it is undisputed that under ERISA a single layperson can function as the appeals decision maker, he or she must nevertheless comply with these federal regulations when making the appellate determination.[10] Based on a review of the record, it appears that the "Committee" has done so.[11] Alternatively, even assuming *arguendo* that Manning is correct that an *untrained committee of one* constitutes a procedural irregularity

under ERISA, the undersigned deems that the appropriate course here is to assess whether the "Committee's" ultimate determination was arbitrary and capricious based on the medical record. For the same reasons stated earlier concerning the initial decision to terminate benefits, the Court cannot make such a finding. This decision does not necessarily foreclose a different result in another case in which a procedural irregularity in the appeals process could contribute to an arbitrary and capricious finding.

### III. CONCLUSION

Defendant paid plaintiff benefits for 9 years, she is still apparently receiving social security disability benefits and her treating medical providers provide some support for her position. In denying her further benefits, defendant receives the benefit of the arbitrary and capricious standard; otherwise the result here might be different. Nevertheless, for the foregoing reasons, the Pension Committee is entitled to summary judgment. Accordingly, it is hereby **ORDERED**:

1. Defendant Johnson & Johnson Pension Committee's Motion for Final Judgment Based on Review of Administrative Record (Doc. 22) is **GRANTED**.

2. The Clerk is Ordered to enter Judgment in favor of the Defendant and against

---

**10.** The Pension Committee points out that there are no cases that directly hold that a single layperson cannot serve as the review committee at the administrative level. There is one recent case, however, that recognizes laymen serve as claims administrators. *See Metzger v. Unum Life Ins. Co. of America*, 476 F.3d 1161, 1166 (10th Cir.2007). In fact, as Manning points out, the Third Circuit, in *Luby v. Teamsters Health, Welfare and Pension Trust Funds*, 944 F.2d 1176, 1183 (3d Cir.1991), notes that, "[a]dministrators may be laypersons appointed under the plan, sometimes without any legal, accounting, or other train-

ing preparing them for their responsible position, often without any experience in or understanding of the complex problems arising under ERISA...." Though such a system certainly lends itself to criticism (as *Luby* recognizes), it is nevertheless the law that must be applied.

**11.** While long on recitation of medical records and short on analysis, the Court does not find, as Manning advocates, that the "Committee's" appeal denial letter failed to adequately consider arguments Manning raised during her administrative appeal.

the Plaintiff, Rose Manning. The Clerk shall close the file.

**DONE AND ORDERED.**